Doris E. **KLEIN**, et al. Plaintiffs

Janet **Wagner**, Plaintiff–Appellant

v.

**STOP–N–GO**, Defendant–Appellee.

No. 85–3591.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 12, 1986.

Decided April 16, 1987.

Before JONES and KRUPANSKY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

Statement by KRUPANSKY, Circuit Judge.

Judges Jones and Celebrezze have decided not to publish their majority opinion reversing and remanding the trial court's resolution of the above-styled case. Since I am of the firm belief that the case addresses important issues of continuing concern to both bench and bar, I have elected not to join them in their disposition of this appeal. Accordingly, I am filing my separate opinion articulating my reasons favoring the affirmance of the trial court's disposition of the controversy, which opinion I am making available to the bench and bar through publication.

For the convenience of the bench and bar, I have attached the full text of the majority opinion as "Appendix A" to the dissent.

KRUPANSKY, Circuit Judge, dissenting.

In *Sahadi v. Reynolds Chemical*, 636 F.2d 1116, 1117 (6th Cir.1980), this circuit in citing to then district judge Guy's decision which paraphrased *Laugesen v. Ana-*

*conda Co.,* 510 F.2d 307 (6th Cir.1975) observed that

> "Congress did not intend that every employer who discharges a person in the protected age group should automatically find himself at the other end of an age discrimination charge."

Because the majority disposition misconstrues the operative facts of this case, the admonition of *Laugesen* and its progeny in this circuit, the existing legal precedent in other circuits applicable to age discrimination actions, the order of proof applied by the trial judge, and because the majority opinion is in direct conflict with *Chappell v. GTE Products Corp.,* 803 F.2d 261 (6th Cir.1986); *Wilkins v. Eaton Corp.,* 790 F.2d 515, 522 (6th Cir.1986); *Merkel v. Scovill, Inc.,* 787 F.2d 174, 178 (6th Cir.), *cert. denied,* 479 U.S. 990, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 70 (6th Cir.1982); *Sahadi v. Reynolds Chemical Co.,* 636 F.2d 1116 (6th Cir.1980); *Morelock v. NCR Corp.,* 586 F.2d 1096, 1104 n. 10 (6th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); *Laugesen v. Anaconda Co.,* 510 F.2d 307 (6th Cir.1975), I must respectfully dissent.

Initially, a more comprehensive and balanced statement of the facts developed during trial is in order. The defendant Stop-N-Go is the owner and operator of a chain of convenience stores in the Indiana, Kentucky, Ohio tri-state area that are open for business twenty-four hours a day, seven days of the week, including holidays. The very nature of the enterprise attracts a limited labor market. The individual stores experience a high employee turnover rate. Plaintiff-appellant Janet Wagner (Wagner) was 41 years old and a member of the protected class when she was employed by the defendant as a store clerk at Stop-N-Go store 553 in August of 1981. During her first year of employment, she was promoted to assistant manager of store 553 and subsequently elevated to manager of store 557. When it became apparent to her district supervisor John Arnett (Arnett), her regional supervisor Ira Royster (Royster) and to herself that she was encountering difficulties delegating duties, managing her subordinates and organizing the operation of store 557, she was reassigned to store number 551 as assistant manager by Arnett with the approval of Royster to permit her to receive further training. The reassignment to permit further training was an exception to the Company's standard operating procedure to discharge managers whose performance ratings were considered unsatisfactory. Wagner admitted that age had not been a factor in her demotion to assistant manager.

Subsequent to Wagner's transfer to store 551, the Company on March 1st of 1983, decided to close the store because it was unprofitable and to transfer all assigned operating personnel to other outlets in the immediate area. On or about March 12 or 13 of 1983, while discussing the cash management practices and procedures of store 551 with tellers and other bank representatives at the Mellon Bank in Cincinnati, Arnett discovered various serious infractions of the Company's Bank Deposit Procedures numbered 3.0 and 3.1 which specified the procedure to be followed by store managers and assistant managers in accounting for and depositing daily cash receipts of all Company stores. An investigation was immediately undertaken by the Company. During the course of the investigation, it was disclosed that Wagner had permitted her husband to deposit daily receipts into the bank contrary to procedures 3.0 and 3.1 of the Company's written rules and regulations.[1] It was further deter-

---

**1.** Contrary to the majority's statement that "... there was no clear Company policy that allowing a non-employee to make bank deposits was grounds for termination," the explicit pronouncements of the Company's written BANK DEPOSIT PROCEDURES when read in context would support a converse conclusion:

3.0 Bank deposits *must* be made daily by the Store Manager or Assistant Store Manager *with no exceptions.*

3.1 If daily deposits are not made, the Store Manager is subject to dismissal.

The majority's position is further eroded by the testimony of the plaintiff admitting that she was fully aware of the bank deposit procedures mandated by the Company; that those proce-

mined that there was a cash shortage at the store in excess of $10,000 as well as a merchandise shortage exceeding $20,000. On March 15, 1983 Arnett and detectives from the Cincinnati Police Department confronted Wagner and interrogated her concerning the cash and merchandise shortages of magnitude at store 511. Wagner denied any knowledge of the cash shortages but admitted that her husband had made bank deposits in violation of the Companys' written directives and further conceded her awareness of the rule infractions. Arnett discharged her immediately at the conclusion of the interrogation advising her that the termination was predicated

dures applied to both managers and assistant managers and that both managers and assistant managers were directly accountable for infractions of those rules:

Q. No doubt in your mind, is there, Mrs. Wagner, that at all times when you were assistant manager and store manager that you were responsible to protect the cash and inventory of the company?
A. Yes.
Q. Were you told that there were certain company guidelines that you had to follow in handling cash?
A. That we were supposed to make bank deposits, yes.
Q. That you individually as an assistant manager was supposed to make bank deposits?
A. Yes, sir.
Q. And that only you and the manager were to make—excuse me, only the assistant manager and manager were to make bank deposits?
A. Yes, sir.
Q. Did you know that there was a written rule to that effect?
A. Yes, sir.

　　*　　*　　*　　*　　*　　*

Q. In the booklet that you had, was the statement in there that's in paragraph three of Exhibit F that bank deposits must be made daily by the store manager or assistant manager with no exceptions? Do you remember that statement?
A. Yes, that's in there.

　　*　　*　　*　　*　　*　　*

Q. Mrs. Wagner, I hold in my hand something entitled, "policy and procedures manual, Stop–N–Go," which is a three ring binder that's subdivided. Did you ever see that booklet before?
A. Yes, I saw it when we were—this was after, late in 1982, we were going over to meetings over in Florence, Kentucky and we were all given one of those and every week we studied a section of it and I only got about one or two sections when everything broke loose and we had to leave the book over at the office, but, yes, I did see that.

　　*　　*　　*　　*　　*　　*

Q. Was it before or after Christmas?
A. I think we had one before Christmas and then one or two after Christmas. I don't know. I don't remember, but I do remember the book.

Q. These were not new policies that were in here, were they? This booklet contained policies that you knew were in existence and that you were operating under at your store every day?
A. I never did see that one book except for the late, last of October, 1982.
Q. But the policies that you reviewed in the book were the same policies you were following in the store, weren't they?
A. I guess so.
Q. To your knowledge, they were?
A. Yes, to my knowledge.
Q. This wasn't a new set of procedures that you were supposed to learn and change your practices, to your knowledge?
A. I don't think so, no.
Q. Mrs. Wagner, you knew when you let your husband make the deposits at store 557, when you were manager, that that violated that written company policy?
A. Yes.
Q. You knew that that was a serious matter?
A. Yes, but my husband had gone to the bank for other managers, so I didn't—I mean I didn't think it was that—you know.

　　*　　*　　*　　*　　*　　*

Q. So far as you know, other store managers who were working during the day, as you were, by themselves, were depositing their daily deposits after work or before work?
A. I guess so. If their assistant manager was there, yes.
Q. Because they weren't supposed to leave the store and make the deposit, correct?
A. You wouldn't leave the store, no, because it would have been empty.
Q. So if the company asks you to make deposits before and after work, you weren't being asked to do anything that every other manager or assistant manager was having to do?
A. No.
Q. Whether they were young or old?
A. Uh-huh.
Q. An assistant manager is just as responsible for inventory loss as a manager, aren't they?
A. Yes.
Q. An assistant manager is just as responsible for cash shortages as a manager?
A. Yes.
Q. An assistant manager is just as responsible for making personal deposits of cash receipts in the bank as the manager?
A. Yes.

upon her violation of the Company written procedures 3.0 and 3.1. The termination date was evidenced by Arnett's written order of discharge, together with the plaintiff's admission that she received no salary payments or employment benefits after that date.[2]

Wagner's supervisor, (Arnett), testified that even if Wagner had not been terminated on March 15, 1985 for her failure to comply with company cash deposit policies, she would have been discharged along with the remaining store 551 employees when the Company terminated them on March 17.[3] It is a conceded fact that every employee that had been assigned to store 551 was terminated as a result of the problems that had surfaced at that store and that it was permanently closed. Of the seven employees discharged, Wagner was the only discharged individual in the protected class.

The record is replete with evidence that individual store profitability and overall Company profits were directly related to three primary operational factors, namely, customer relations, cash management and "inventory shrink". Aside from the Company's printed rules and regulations dealing with these subjects, Company supervisory personnel conducted weekly meetings with store employees to constantly impress the importance of these practices. The inferences of the majority opinion to the contrary, known infractions of the rules directing the procedure to be followed by supervisors, managers, and assistant managers in accounting for daily cash receipts and bank deposits were strictly and uniformly enforced.[4]

**2.** Arnett identified his signature on an employee separation form dated March 16, 1983 which stated that Wagner had been terminated for "letting unauthorized persons take deposits to the bank." Arnett further verified that the separation form had been executed on March 16, 1983.

**3.** Prior to the discovery of cash and merchandise shortages the company had planned to reassign all store 511 employees to other stores when the company closed that outlet. The transcript of the record does not fully develop the ultimate conclusion of the official investigation undertaken by the police authorities. It is evident that neither Wagner nor any other employee assigned to store 511 were ultimately charged or prosecuted for any criminal offense subsequent to the confession of Marsha Hood who admitted to embezzling the cash funds from store 551. It appears that the investigation was terminated without fully exploring the causes and personnel involvements which resulted in the merchandise shortages. It is, however, apparent from the record that during the course of the investigation the company became apprehensive that employees who had been assigned to store 511 might have a corrupting influence upon employees at other outlets if reassigned; consequently, Stop–N–Go unilaterally terminated all store 511 employees. Arnett was also terminated on or about the 18th of March, 1983 as a result of his failure to perform required cash audits in accordance with the Company's cash accounting rules and regulations.

**4.** On cross-examination of the plaintiff, it was disclosed that while she was a clerk, her store manager Keith McKenzie, who had permitted the plaintiff's husband and others to make bank cash deposits without the express authority of supervisory personnel under emergency situations was discharged when a bag of money was lost and his failure to follow company rules became known to the company. At the time of his discharge, he was less than thirty years of age.

Plaintiff conceded that Company cash deposit rules were waived *only with express supervisory authority* under *emergency conditions*.

Q. You felt that just because Mr. McKenzie had permitted your husband to do it that it was alright for you to do it? [deposit daily cash receipts into the bank]
A. In certain exceptions, in emergencies, yes.
Q. But you didn't just have your husband deposit money in emergencies?
A. When I was working like twelve hours and after I was followed to the bank that time, and like I would come in at seven sometimes and work 'til seven at nighttime and I knew my husband couldn't meet me and we would go to the bank together, yes, I would call him in earlier in the morning to go to the bank.
Q. That was at your convenience.
A. I was protecting the company's money just so the money got to the bank.
Q. But the company had instructed you, had they not, that they expected you personally to deposit the money and that that's how the company wanted you to protect the company's assets, by having you do it?
A. I made most of the deposits, yes, until after I was followed to the bank, yes.
THE COURT: I don't think you understood the question. Ms. Kuppin, read the question.
(Question read back.)
A. Yes.
Plaintiff admitted further that Jill Gumm, who was also a store manager of an outlet while

Apart from the plaintiff's factually unsupported, self-serving, subjective conclusions, there is no probative evidence in the record that would support the majority's premise that the plaintiff's infractions of the Company's cash management mandates were known to the Company supervisory personnel, particularly Arnett, or that the Company through Arnett or other supervisory personnel expressly or tacitly approved or authorized plaintiff's conduct.

A. Well, I knew it was up to the manager, or the assistant managers to make bank deposits, yes, but I guess I knew I shouldn't have left him [plaintiff's husband] do it, but I did it anyway, yes.

Q. You knew that you shouldn't have let him do it?

A. Yes, because I was only assistant manager at that time, yes.

Q. But you let him do it anyway, despite the fact you knew you shouldn't have let him do it?

A. Yes.

Q. I want to redirect your attention back to Mr. Arnett at 557. That's the only place where you say Mr. Arnett saw your husband with the bags, deposit bags, right?

A. Yes, uh-huh.

Q. Were there occasions when bank deposits were dropped in the night depository and the next day or the day after that, you picked up the empty deposit bag and the deposit slip and brought it back to the store?

A. Yes, there were times like that when —because on Thursday, you had to have all them deposit slips from all week to put in the purolator bag and send to their Stop–N–Go office up in Dayton, Ohio, yes.

Q. As a matter of fact you had three or four empty bags in the store because it took a delay of a day or two in order to get the bag back again from the bank?

A. Yes.

\* \* \* \* \* \*

Q. So far as you know, Mrs. Wagner, Mr. Arnett, when he saw your husband come in with the empty deposit bag, so far as you know, he thought your husband was picking up the empty bag at the bank and bringing it back?

A. No, I don't think so. I think he knew my husband was going to the bank for me, I really do. I know he knew.

Q. The only testimony you've given that he knew was the testimony that your husband, that he saw your husband bring back empty bags; is that right?

A. Yeah, he brought back the empty bags with the deposit slips in them.

Q. He never saw your husband walk out of there with a bag full of cash?

A. No, no.

Q. When your husband came back into the store with the empty bag, and you say Mr. Arnett was standing there smiling at you, did you ever say to Mr. Arnett, "Oh, by the way, my husband has been making these deposits, it's okay, isn't it?"

A. No, I didn't ever say that to him.

Q. You never mentioned to Mr. Arnett that your husband was making deposits?

A. No. I didn't mention it to him because I figured if he—he would have written me up or something or warned me if I was doing something wrong.

Q. Exactly. You didn't mention it to him because you were afraid he would warn you?

A. No, I mean, I don't care. If he would have written me up, I would have quit it. I mean I wouldn't—but

---

plaintiff was assigned as a clerk was terminated for infractions of the Company's cash management regulations when the infractions became known to the Company. She was less than thirty years of age at the time of her discharge.

Arnett, plaintiff's immediate supervisor, was also terminated on March 18, 1983 for his failure to strictly implement the Company's cash audit rules. Arnett was thirty-four years of age on the date of his discharge.

he didn't write me up. Didn't say nothing to me.

Q. Of course, if he misunderstood what was going on there, he wouldn't say anything to you?

A. I guess not.

On March 22, 1983 and thereafter, subsequent to closing store 551 and the discharge of all employees that had been assigned to that outlet, the Company, in an effort to prevent a reoccurrence of the exhorbitant cash and inventory losses incurred at that location, conducted a series of instructional meetings for its store managers. The thrust of the meetings was to discuss future practices and procedures to reduce and eliminate future cash and inventory shrinkage. Supervisory personnel attempted to impress upon store managers and employees the necessity for vigilence in detecting and reporting dishonest employees and the need to conscientiously implement Company rules and regulations addressing cash management and inventory controls. During the course of these meetings, individual store managers voiced concerns they experienced in dealing with indolent and intractible employees of longstanding who had become indifferent and fixed in their ways in performing their duties and antagonistic to direction and change. It was within this climate that Royster and Becky Abell (Abell) were attributed with incriminating age discriminatory declarations, i.e. "... get rid of the older employees ...", "set older employees up", and "old bitches" upon which statements the majority opinion has heavily relied to support its conclusion that the dialogue reflected a general attitude of the defendant to discriminate against employees within the protected class. In considering such remarks, I agree with the majority's statement that "... such remarks should not always be discounted entirely, depending on the context in which they are made." Viewing the controversial statements in the context of the exchange, I am unable to ascribe to the meaning adopted by the majority. In reviewing the record, it is apparent that the phrase that all managers "should get rid of the older employees ... and the people that are stealing"

was not age-related, but, rather, descriptive of employment longevity with the Company, namely, employment seniority with the Company. The pertinent testimony provided by the plaintiff's witnesses disclosed the following:

A. The reason they had the meeting is a lot of things were discussed about problems because the Plainville store [551] had closed and they had the big shortage there and they were discussing different things that the managers maybe would have some problems with the employees and many things were discussed, but one thing in particular he said, get rid of the older people and also the people that are stealing. When he said that, I took it to mean older people in age and not older people with the company.

THE COURT:

Now, may I see counsel, please. At Side Bar: Mr. Lips, I don't want to get sucked into something either intentionally or unintentionally. Part of that answer is inadmissible but you didn't object.

My concern is that at an appeal, you would point out that you did object. I let her answer. Part of the answer is inadmissible. The last part is clearly inadmissible. What she understood it to mean. She may testify what somebody said and that's all she can do.

\*     \*     \*     \*     \*     \*

THE COURT:

What the man said was admissible. Her interpretation of what he meant is not admissible. Do I understand that you are now objecting?

MR. LIPS:

I'm now objecting, not only that, I'm going to deal with it on cross if you don't strike the testimony.

THE COURT:

I'm going to strike the testimony. I didn't wish to be maneuvered into a position where you let that in and it's obviously error.

Additional testimony developed by the plaintiff confirmed that Royster's charac-

terization "older employees" was not age-related but rather descriptive of employee seniority with the Company and the intractibility of such senior employees to implement changing Company policy.

A. At the managers' meeting, that's right after Mary got fired, and he said that Mary wouldn't change with the company policies, that she was too set in her ways and too old fashioned. John, he would comment in there too on that she wouldn't—that she was too old fashioned and just about the same as Ira would and that if any of the other managers would be—wouldn't change with the policies, even if they had been there for awhile, then that they would be let go too, just like Mary.

\*　　\*　　\*　　\*　　\*　　\*

Q. What did you say and what did he say?

A. He come in and told me that they did have to let Mary go that morning and he was consulting with me because he knew that I knew her for a long time, that I was close to her and that he was saying about the same thing then that they said at the managers' meeting, that, you know, she was too set in her ways, she wouldn't change, she was too old fashioned, that's why they had to let her go.

\*　　\*　　\*　　\*　　\*　　\*

Q. Who was present?

A. It was the managers of the Ohio stores, myself, Betty Friedman, Doris Klein, there's two other managers, Leslie Thompson and Norma—I can't remember her last name.

Q. Was any representative from top management there?

A. Yes, Ira Royster.

Q. What did Mr. Royster say at the meeting?

\*　　\*　　\*　　\*　　\*　　\*

A. He was assuring us managers what had happened to John Arnett, John Arnett had been let go from the company and him being our supervisor, we were wondering what would happen to us managers, and Ira assured us that we would still maintain being managers of our stores.

We were discussing inventory control and Leslie Thompson asked if she could fire a particular employee of hers, which was Phyllis Dolby, and Ira asked her why she wanted to, and she said, "I just don't care for her to work for me because she's bossy," and Ira said, "Is she dishonest," and Leslie said, "No." He went on to say, "Well, get rid of her." He went on to say that we should get rid of any older employees that we felt may be dishonest or—I'm looking for the word to say—might be making our inventories come up short.

\*　　\*　　\*　　\*　　\*　　\*

Q. It was such a huge loss that it practically would take a tractor-trailer truck or several to haul that much merchandise out of there, is that right?

A. Yes. He explained what caused it.

Q. He did?

A. Ira Royster.

Q. He covered the whole inventory loss and then he discussed inventory losses in your stores, right?

A. Right.

Q. He said, "We have to control all this inventory loss," didn't he?

A. Right.

Q. And when he talked about controlling it, did he talk about discharging anybody who was felt to be dishonest or responsible for inventory loss?

A. Yes, he mentioned that, for all of us to take a good look at our employees.

Q. All of them?

Q. Yes.

Q. Young and old?

A. He said all of them, yes.

Q. You had some new employees who had been there a short period to time?

A. Uh-huh.

Q. And some more senior employees who had been there a longer period of time?

A. Right.

Q. And didn't you in your own conversation with your own employees and your own store refer to the more senior employees as the older employees from time to time, didn't you make those references?

A. No, I didn't. All of my help were new.

Q. But you've heard other company managers talk about the older employees when they were referring to the more senior employees?

A. Yes.

Q. Those that had been there longer?

A. Yes.

\*　　\*　　\*　　\*　　\*　　\*

A. Two to five years is what it usually ran that I know of, except for maybe an exceptional one or two.

Q. Then that type of person is considered an older employee as opposed to a newer employee?

A. Yes.

Nor does the record when read in context support the conclusion that Abell's suggestion to "set up older employees" preliminary to termination support a conclusion that it reflected a Company position to discharge employees because of age. The phrase "set up" applies to a security practice generally implemented by business enterprises similar to those of the defendant to test the honesty of employees' entrusted with cash receipts. Plaintiff's witnesses testified during cross-examination to the practice and the circumstances under which it was employed in the case at bar:

Q. ... Can you get back to my question about what Becky Abell said about getting rid of older employees?

A. She made a statement to Leslie Thompson how to get rid—

Q. Excuse me. Before you say that statement, would you tell me how you know about what that statement was. Were you there?

A. I was there at the meeting when this was being discussed on how to get rid of the older employees.

Q. Tell us about that statement.

A. When Leslie asked Becky how would you get rid of an older employee, Becky said to use what they called setting them up.

Q. Tell us what that is.

A. That's when the manager puts an extra twenty in the cash register during that clerk's shift. The next morning, if it's [clerk's cash accounting] over twenty dollars, that means that clerk was honest enough and didn't take that overage. If the twenty was missing, [unreported by the clerk] then you could fire the person for stealing twenty dollars out of the register.

Q. That was a standard technique used by Stop-N-Go and, to your knowledge, other retail businesses for catching clerks who steal cash?

A. Yes.

Q. There wasn't anything unusual about that system, was there?

A. No.

Q. Wasn't Mrs. Thompson's question how to get rid of employees who were stealing?

A. No, It was more directed to how to get rid of Phyllis Dolby.

Q. Exactly, not older employees, but Phyllis Dolby?

A. Yes.

The context of the record alluding to the term "old bitch" during the pertinent verbal exchange at the meeting of March 2, 1983, again, does not reflect an age discriminatory attitude of the Company conveyed through its management personnel. The testimony as developed through plaintiff's witness and the comments in the ruling of the court follows:

A. ... We were discussing inventory control and Leslie Thompson asked if she could fire a particular employee of hers, which was Phyllis Dolby, and Ira asked her why she wanted to, and she said, "I just don't care for her to work for me because she's bossy," and Ira said, "Is she dishonest," and Leslie said, "No." He went on to say, "Well, get rid of her." He went on to say that we should get rid of any older employees that we felt may be dishon-

est or—I'm looking for the word to say—might be making our inventories come up short.

\* \* \* \* \* \*

Q. After that meeting, was there another store managers' meeting soon after?

A. Yes. It was within about two weeks.

Q. Where was that?

A. It was at the same place, Forest Park.

Q. Who was present?

7. Becky Abell. She had just been assigned as our new supervisor to take John Arnett's place.

Q. At that meeting, what did Mrs. Abell say or Miss Abell?

A. Basically, the same discussions were discussed same as when Ira Royster had come down and talked to us. We talked about inventory control, inventory shortages, employees. She said to post signs that we would be hiring quite a few people. Again, Leslie Thompson asked if she could fire Doris (Kline), and Becky said, "yes, fire the old bitch."

\* \* \* \* \* \*

Q. What did Mrs. Abell—Miss Abell say?

A. Well, we again, we were discussing, you know, problems that we would have and Leslie Thompson, which she was a manager, okay, she was complaining about Phyllis Dolby and she said, "That old bitch is giving me a lot of problems," and Becky Abell said, "Set her up and fire the old bitch."

THE COURT:

May I see counsel? At Side Bar:

THE COURT:

Mr. Tobias, and that shows a policy of the company? Whether she called her an old bitch or a bitch, did that make any difference? Does that set up age discrimination?

MR. TOBIAS:

Not alone. We have bits and pieces of evidence about the attitude of the com-

pany towards older people. That alone is just one piece.

THE COURT:

·Alright. I'm going to exclude it. I think that it is so immaterial and so much a part of every day speech that it is not evidence of anything.

The statistical effort of the plaintiff to support her charges of age discrimination were equally without significant probative value as evidenced by the record. It was undertaken by a lawyer associated with plaintiff's counsel without expert consultation, advice, or direction. The methodology employed to derive the basic sample calculations defied every rudimentary principle of statistical analysis and every legal evidentiary qualifying precept enunciated by *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir.1984); *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974); *Pace v. Southern Railway System*, 701 F.2d 1383, 1389 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed. 2d 724 (1983); *Coble v. Hot Springs School District*, 682 F.2d 721 (8th Cir.1982). David G. Torchia (Torchia), a legal associate in the office of plaintiff's counsel, was without training or expertise in the field of statistical analysis and accordingly, could not and did not qualify as an expert witness. His highly arbitrary, selective and exclusionary methodology to compose the impermissible, age-related discharge sample from a total of 33 discharges for the 12–month period here in issue resulted in a statistically valueless result.

Q. How did you prepare this exhibit?

A. I counted the number of people who were discharged within that twelve month period, between January first of 1982 and December 31st of 1982. Within that twelve month period, there were a total of thirty-three discharges. Of those thirty-three people that were discharged, I excluded nine people because their birth dates were not available. That left a total of twenty-four employees who were discharged within that twelve month period and out of those twenty-four, three were over the age of forty.

I then excluded additional employees who had worked less than thirty days. After doing that, there were eleven employees who had to be excluded who I excluded because they didn't work thirty days. That left a total number of discharges for that period of thirteen.

The procedure derived a sample of 13 terminations during the period in issue which limited sample was not numerically significant to support any meaningful statistical inference within the standards of existing legal precedent. "The courts have consistently rejected similar statistical samples as too small to be meaningful." *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir.1984); *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974); *Pace v. Southern Railway System*, 701 F.2d 1383, 1389 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983); *Coble v. Hot Springs School District* 682 F.2d 721 (8th Cir.1982).

In commenting upon the plaintiff's statistical evidence, the court perceptively observed:

> THE COURT:
>
> Bear with me for a moment, Mr. Lips. Mr. Tobias or Miss Hauck, either one, how do you respond to the authority in Haskell vs. Kaman that the sample must be large enough to permit an inference that age was a determining factor? You don't have that here. You have a substantial unknown factor. How can you have testimony that tends to indicate that half the people discharged were over forty, when you really don't know that that was true? This is Exhibit 16, because a significant portion, three of fifteen is one-fifth, that's twenty percent, are unaccounted for. Do you have any response to that?
>
> MR. TOBIAS:
>
> Your Honor, because the time limitations that we had, we just did the best we could. We examined the files. This is the information we found and this is what we have.
>
> THE COURT:
>
> Mr. Tobias, nobody is accusing you of hiding anything, but I'm accusing you of distorting. Your motives may have been of the very best but the reality is that there is a substantial factor here that isn't accounted for. I don't know what it is. For all I know, none of them were over forty. It may have been six out of fifteen are over forty, but it could also have been nine out of fifteen.
>
> I suggest to you that when you deal in numbers of that size, that can be a significant difference. We go back to Kaman which says the sample must be large enough to permit an inference that age was a determining factor. You have the means available to you. You or the predecessor counsel—I can't respond to that. But I'm concerned about testimony that contains within it such a substantial unknown.
>
> MR. TOBIAS:
>
> I understand the concern. My only response would be that the jury—the trier of fact has all the facts.
>
> THE COURT:
>
> *But they don't, Mr. Tobias, that's precisely the point.* You have a conclusion here that six out of twelve discharges from the period between January 1, 1983 and 6–30–83 were over forty and that isn't true.
>
> MR. TOBIAS:
>
> We have not misled the trier of fact.
>
> THE COURT:
>
> You have certainly confused the trier of fact, Mr. Tobias, and I repeat to you once again, I'm talking of Haskell vs. Kaman, which sets forth a specific as to statistical evidence.

Apart from the distortion of magnitude prompted by the methodology employed to derive the sample, the statistical inferences which may have been developed from the calculations were obviously grossly inaccurate and meaningless. Plaintiff failed to define the universe or its composition, the constant age of the workforce and other

material factors which would have afforded a basis from which meaningful statistical comparisons could have been evolved.

The statement of the facts summarized herein represented the sum and substance of the plaintiff's evidence as developed through her witnesses on direct and cross-examination. The sufficiency of the plaintiff's evidence to support a *prima facie* case was placed in issue by the defendant's motion for a directed verdict at the conclusion of her case. It is appropriate to note at this juncture of this dissent that the conclusion of the majority opinion which states "the district court noted that Wagner ... had produced sufficient statistical and circumstantial evidence to meet her *prima facie* burden" is misconceived. It is obvious from the record that the trial judge had substantial doubts as to the sufficiency of the proof to withstand the motion which doubts were apparent from his comments:

THE COURT:

> I will tell counsel, very bluntly, I *have substantial doubts in my mind about the evidence to this point,* but I can't say that it is clear that reasonable men could come to but one conclusion.

He did not, as surmised by the majority, rule that the plaintiff had satisfied her *prima facie* burden of proof. Reflecting the wisdom of his experience, the trial judge resolved every benefit of doubt in favor of the plaintiff and reserved his ruling on the defendant's motion and placed the election to go forward upon the defendant:

THE COURT:

> *I'm going to take your motion, Mr. Lips, under submission. I'm not going to rule upon it.* I do propose that we go forward with your first witness. Bring in the jury, please.

The defendant opted to proceed with the trial and developed direct, affirmative reasons and evidence legally sufficient and significantly probative to justify a judgment for the defendant which reasons had already been supported by admissions elicited during the cross examination of plaintiff's witnesses.

This appellate review is accordingly confronted with resolving the propriety of the trial court's decision to grant the defendant's motion for a directed verdict in this ADEA jury case. Orderly consideration mandates:

(a) definition of the substantive elements of the particular ADEA claim asserted by the plaintiff;

(b) assignment of the order and burden of proof imposed upon the adversaries by the particular facts of this case;

(c) identification of the appropriate standard for assessing the evidence on a defendant's motion for directed verdict in this ADEA proceeding;

(d) application of the appropriate standard to the particular evidence adduced in light of the production burdens imposed.

The substantive elements of an ADEA claim are: (a) that an employee covered by the act (b) has suffered an unfavorable action by an employer covered by the act (c) under circumstances in which the employee's age was a determining factor, and but for the employer's motive to discriminate against the employee because of her age, she would not have been discharged. 29 U.S.C. § 623(a)(1). In the case at bar, coverage and unfavorable action are not in controversy, thus, the single dispositive issue is the narrow one of motivation, i.e. whether the employee was treated unfavorably because of her age. Motivation in an ADEA action may be proven in the ordinary classical manner by any direct or indirect relevant evidence of sufficiently probative value without resort to any special judicially created presumptions or inferences related to the evidence.

In assessing the burden of proof to be imposed upon the respective parties, the trial court noted that the parties having conceded that the claimant Wagner, subsequent to her discharge had not been replaced by a younger person, precluded an order and burden of proof featuring a rebuttable factual presumption favoring claimants in the initial stages of proof evolving from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980) and progeny.

Accordingly, the plaintiff was burdened with proving through direct evidence a stated purpose to disfavor her because of age, or through the cumulative effect of admissible, indirect or circumstantial evidence of sufficient probative force and effect independent of the judicially created *McDonnell Douglas* presumption to warrant submission of the motivational issue to the jury.

In considering the propriety of the district court's ruling upon the defendant's motion for a directed verdict at the conclusion of the trial, it is appropriate to initially determine if the plaintiff carried her original production burden on the motivational issue without resort to the *McDonnell Douglas* presumption.

The claimant does not urge nor does the record disclose direct evidence to support a conclusion that age was a determining factor for her discharge. The plaintiff has, however, asserted during trial and before this court on review that the cumulative effect of the circumstantial evidence hereinbefore discussed was of sufficient probative force to withstand the defendant's motion for a directed verdict and warranted submission of the motivational issue to the jury.

To properly assess the plaintiff's argument, my attention is initially directed to the universally accepted legal precedent that in considering motions for directed verdict and for judgment n.o.v. courts are admonished to consider *all* of the evidence —*not just that evidence which supports the non-mover's case* as the majority has done herein—albeit in the light and with all reasonable inferences most favorable to the party opposed to the motion without weight or credibility assessments. If, upon such consideration, it appears that the facts and the inferences are so strongly and overwhelmingly in favor of one party that the court believes that reasonable minds could not arrive at a contrary verdict, granting of the motions is proper. A mere scintilla of evidence, however, is insufficient to present a question for the jury. A motion for directed verdict and judgment n.o.v. should not be decided by weighing the evidence and/or assigning credibility to witnesses or deciding what side has the better case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969); *Grooms v. Minute-Maid,* 267 F.2d 541 (4th Cir.1959); *Simblest v. Maynard,* 427 F.2d 1 (2d Cir.1970).

Having stated the general rule for evaluating motions for direct verdict and judgment n.o.v., the next and more perplexing problem is to define the standard by which the *sufficiency* of the evidence of the ultimate motivational issue should be determined. The rule has been succinctly capsulized by Judge Haynsworth in *Ford Motor Company v. McDavid,* 259 F.2d 261, 266 (4th Cir.), *cert. denied,* 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958) wherein after finding insufficient the circumstantial evidence of causation in a manufacturers negligence case and upon conceding that "it is the province of the jury to resolve conflicting inferences from circumstantial evidence," he stated that "[p]ermissible inferences must still be within the range of reasonable *probability* and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."

The rule and its purpose was summarized in the Fourth Circuit decision in *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 241–42 (4th Cir.1982):

> ... in *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d 1061, 1066 (4th Cir.1969), Judge Haynsworth, ... finding conflicting inferences of the cause of personal injury "equally probable," hence for jury resolution, nevertheless again emphasized *"reasonable probability"* as the *proper test of sufficiency* of circumstantial evidence to support the necessary inference. "The relevant question ... is

... whether a jury might reasonably conclude from the evidence that [the necessary] inference was more probable than the [sole conflicting] inference...." *Id.* at 1066. Or, more succinctly, *"if the inference sought to be drawn lacks substantial probability,* any attempted resolution of the question may well lie within the area of surmise and conjecture," *id.,* so that the issue should not be submitted for jury consideration. (emphasis added)

This emphasis, *where causation is dispositive* upon *"probability," "reasonable probabilty," "substantial probability"* rather than mere *"possibility"* as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere "possibilities," by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon claimants and subjected to the ultimate jury control devices of directed verdict and judgment n.o.v. *See Brady v. Southern Railway Co.,* 320 U.S. 476, 480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943) (to guard against "the mischance of speculation over unfounded claims"); *Galloway v. United States,* 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1942) (to insure that "speculation be not allowed to do duty for probative facts"). The special danger in the causation context invites and justifies the special emphasis. (emphasis added)

This circuit in *Wilkins v. Eaton Corp.,* 790 F.2d 515 at 523 (6th Cir.1986) adopted the "reasonable probability" rule enunciated in *Lovelace:*

There must be evidence of discriminatory purpose, *Ackerman,* 670 F.2d at 70, and there must be evidence from which a reasonable jury could conclude that age was the *more likely* reason for Wilkins' discharge, rather than merely a specula-

tive possibility. *See Lovelace,* 681 F.2d at 241–42, *Sahadi v. Reynolds Chemical,* 636 F.2d 1116 (6th Cir.1980) (per curiam). We are convinced that the evidence "does not suffice to support as a reasonable probability the inference that but for claimant's age he would not have been discharged." *Lovelace,* 681 F.2d at 243.

*See also Merkel v. Scovill, Inc.,* 787 F.2d 174, 178 (6th Cir.), *cert. denied,* 479 U.S. 990, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 70 (6th Cir.1982); *Sahadi v. Reynolds Chemical Co.,* 636 F.2d 1116 (6th Cir.1980); *Morelock v. NCR Corp.,* 586 F.2d 1096, 1104 n. 10 (6th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

The test of evidentiary sufficiency articulated in the cited judicial precedents is an equally appropriate one for the disposition of motivational issues in ADEA jury cases.

Quantified against prevailing criteria, the cumulative effect of the plaintiff's circumstantial evidence, independent of a judicially created *McDonnell–Douglas* presumption and taking into account both direct and cross-examination, was patently insufficient to support as a "reasonable probability" an inference that but for the claimant's age, she would have not been discharged.

Taken in its entirety, the evidence, in summary, disclosed a simple cascading sequence of coincidences, uncomplicated by ulterior Company motivation, that engulfed the plaintiff in a maelstrom of events which culminated in her discharge along with the discharge of every other employee assigned to store 551. Claimant was initially employed at age forty-one while already a member of the protected class. She was given every consideration and opportunity for training and advancement during her employment history with the Company. She was promoted to the position of assistant manager with a bright future of upward mobility within the Company. Unfortunately, coincidence placed her in the position of assistant manager of store 551. Some time after assuming her duties, coincidence surfaced a series of ir-

regularities at the store which prompted an investigation of its operation. During the inquiry, it was determined that the outlet had experienced cash shortages approximating $10,000 and merchandise shrinkage exceeding $20,000. Although the plaintiff was not directly implicated or prosecuted for any criminal offenses, coincidentally, during her interrogation she admitted to knowingly violating written Company cash management rules and regulations, the consequence of which was discharge. Immediately subsequent to her admissions, claimant was discharged. Within two days, the remaining six employees assigned to store 551 were also terminated and the store was permanently closed. Of those terminated, only the plaintiff was a member of the protected class. Apprehensive of contaminating other outlets by reassigning employees from store #551, the defendant elected to terminate everyone without exception, including Arnett the area supervisor.

Comparable statements[5] and statistical presentations to those characterized by the claimant in this case as reflecting an employer discriminatory age bias, which represents the only circumstantial evidence upon which she would fabricate this action of age discrimination, have been considered and rejected by other courts as being far too abstract, irrelevant, isolated, and remote to infer a nexus between age discrimination and adverse employment action.

As recently as October 14, 1986, a panel of this court reiterated existing Sixth Circuit precedent in commenting upon a factual situation strikingly similar to those presented herein. *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 n. 2 (6th Cir.1986) rejected isolated superficial comments in derrogation of age in the following language:

Chappell also contends that the district court erred in excluding evidence of purported age biased statements allegedly

made out of court by Sylvania's agents. One of the statements allegedly made by a supervisor to Manual Shewmaker was "surely you must have noticed the young people taking over up front." The other statement was made in a dialogue between a former employee and former supervisor. The employee allegedly stated, "we old timers know the procedure as to how things operate within the company." The supervisor's response was "Don't categorize me in that with you." This district court ruled that the statements were prejudicial, and Chappell did not prove that Sylvania's agents had specific authority to make the statements. We agree. Such comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination. *See Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir.1984).

In *Haskell*, the Second Circuit defined the standards by which to judge statistical evidence for purposes of ADEA actions. Since that time, courts have mandated that statistics are of no avail when not placed in a relevant context to be probative and must present a bases from which a discriminatory pattern is evident. More specifically, for such statistical evidence to be probative, the sample must be large enough to permit an inference that age was a determining factor in the employer's decision. *See Chappell v. GTE Products Corporation*, 803 F.2d 261 (6th Cir.1986); *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir. 1984); *Lindsey v. Southwestern Bell Tel. Co.*, 546 F.2d 1123 (5th Cir.1977); *Pace v. Southern Railway System*, 701 F.2d 1383 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983); *Coble v. Hot Springs School District*, 682 F.2d 721 (8th Cir.1982); *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974).

---

5. It is apparent that when the terms "old bitch" and "old boy" are viewed within the context of record that the terms had no age bias animus and the trial court properly concluded as did this circuit in *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 n. 2 (6th Cir.1986), that the characterizations were far too abstract, isolated, attenuated to convey an inference of a nexus between age discrimination and claimants discharge—especially when it is conceded that the remarks were not directed at the plaintiff.

Assessed independently of a *McDonnell–Douglas* presumption, it is obvious that the cumulative effect of the circumstantial evidence in this case does not rise to a point of sufficiency to support as a reasonable probability the inference that but for the claimant's age she would not have been discharged. On this basis to conclude that age was a determining factor for claimant's discharge could only be the result of outright conjecture and not by any rational assessment of probabilities.

In concluding, I am constrained to comment upon the district court's conduct of this trial. From its commencement, the trial judge exercised an inordinate degree of patience and restraint in attempting to advise plaintiff's counsel of the burden of proof placed upon the claimant by existing legal precedent to prove a prima facie case. His rulings on all evidentiary issues were correct and referenced to appropriate legal citations that were reviewed in dialogue with counsel for both parties. Plaintiff's counsel either failed to fully comprehend his responsibility to support a *prima facie* case or refused to accept the responsibility mandated by law. The trial court's continuing admonition that proof the core issue that age was a determining factor of her discharge was an essential condition precedent to proof of pretext went unheeded by plaintiff's counsel throughout the proceedings. Claimant had great difficulty in distinguishing the legal principle that pretext inherent to ADEA cases mandated affirmative proof that the defendant's articulated legitimate business reasons for the discharge were not just pretextual in a general sense but rather that the articulated legitimate reasons given for her discharge were a *pretext or coverup for the real reason for the discharge which was intentional age discrimination. See, Wilkins v. Eaton Corp.,* 790 F.2d 515, 523 (6th Cir.1986).

At the conclusion of the plaintiff's case, the trial court extended the longevity of the plaintiff's case by reserving its ruling on the defendant's motion for a directed verdict, at the defendant's expense, thereby affording the plaintiff additional opportunity to develop a *prima facie* case of age discrimination which the plaintiff failed or was unable to do either through cross-examination of defendant's witnesses, or by direct and/or circumstantial probative evidence during rebuttal.

At the conclusion of all of the evidence and upon renewal of the defendant's motion for directed verdict, the trial judge, after meticulously reviewing the evidence and the law, concluded that:

It is this Court's opinion that that's where we are in this case. A person who incidentally is over the age of forty was discharged along with a group of other individuals who were employees of a store that, number one, apparently was not economically successful and, number two, was the place where some serious mishandling of company money and property occurred.

I assert, as I have in the past, in this case, the test is not whether the employer is a nice outfit to work for. If called upon, I would hold that in this particular instance, this particular employer is not a particularly nice outfit to work for. It may well be that they acted hastily. It may well be that they acted incorrectly, but that is not enough.

I do not believe that the Age Discrimination in Employment Act is directed only at unpleasant employers.

*The plaintiff has failed to establish, in this Court's opinion, sufficient evidence* that she was discharged for a determining reason, to wit, her age.

The court reasserted its position when it discharged the jury in the following language:

THE COURT: Members of the jury, you were excused from the courtroom while counsel argued a point of law. The point of law being whether or not the plaintiff had established what is known as a prima facie case. I have determined that the plaintiff did not and I have directed a verdict in the defendant's favor.

Let me take a minute to explain to you why this has been done. The issue in an age discrimination case is not whether or

not a plaintiff has been treated fairly. That's simply not the issue.

The issue is not whether the employer was inconsistent or unpleasant or mean or unreasonable. Employers can be all of those things and still not run afoul of the Age Discrimination in Employment Act.

The sole issue in this case is whether or not age was a determining factor in the action of the employer. Now observe, age may be a factor, but if it wasn't a determining factor, there is no cause of action against this defendant.

The court thereafter again reasserted its position in a well-written opinion.

In sum, the trial of this case is an example of orderly, tireless, patient administration of impartial justice by a judge thoroughly versed in the law as it impacted the issues of what appears to be a case that, since its inception, had no substance. I would accordingly AFFIRM the judgment of Judge Rubin.

### APPENDIX A

### UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

DORIS E. KLEIN, et al., Plaintiffs

JANET WAGNER, Plaintiff–Appellant

v.

STOP–N–GO, Defendant–Appellee.

No. 85–3591.

April 16, 1987.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

Before JONES and KRUPANSKY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

Plaintiff Janet Wagner appeals from a directed verdict entered against her in this action alleging a violation of the Age Discrimination in Employment Act (ADEA). After reviewing the record in this case, we reverse.

Wagner was born in 1940. She was hired by Stop–N–Go in August 1981 as a grocery store clerk in Store 553. At that time the supervisor for that store was John Arnett. Mr. Arnett supervised six stores in the Cincinnati and Northern Kentucky area and reported to the district manager of the entire region, Ira Rovster.

On March 15, 1982, Wagner was promoted from grocery store clerk to assistant manager in the same store. On July 1, 1982, she was promoted to manager of Store 553. She was demoted back to assistant manager and transferred to Store 551 in February 1983 due to personnel and financial problems in Store 553 for which she was held responsible. Stop–N–Go had a company policy that only the manager or assistant manager make the store's deposits. Wagner often permitted her husband to make bank deposits for the store. Arnett was, however, present on at least two occasions when Wagner's husband came into the store and handed her an empty bank bag.

In mid-March 1983, Stop–N–Go discovered major cash shortages at Store 551. Ira Royster and Arnett conducted an investigation of the store's substantial inventory shortage and missing cash deposits. Store manager Marcia Hood and Wagner were questioned by the police concerning the missing money. During the investigation Wagner admitted that she had permitted her husband to make a bank deposit earlier in the week before the theft was discovered and on many other occasions when she had managed Store 553. According to testimony, she was suspended at that time. Hood subsequently confessed to embezzling some of the cash and was subsequently fired and prosecuted. Arnett, the supervisor, was also fired. There was no evidence that Wagner had anything to do with that crime. In addition to Arnett, Hood and Wagner being released, four other employees at Store 551 were laid off. Of the seven terminated, Wagner was the only one within the protected age category.

Wagner filed suit in the district court alleging that Stop–N–Go discharged her be-

cause of her age. The district court denied Stop–N–Go's motion for a directed verdict at the close of Wagner's proof finding that there was statistical and circumstantial evidence of age discrimination that raised a factual question for the jury. During its presentation of the case, Stop–N–Go argued that Wagner was terminated for permitting her husband to make bank deposits in violation of company policy. The district court concluded that although Wagner devoted most of her case to her effort to prove this reason was pretextual, there was no evidence presented of a situation where a violation of company policy arose with a substantial shortage of inventory and missing corporate funds. It also concluded that Wagner presented no evidence that age was a determining factor in the discharge. Since all employees associated with the store had been fired in a short period of time, the district court concluded that age had nothing to do with the decision to terminate her.

For a case to be properly submitted to the jury, there must be " 'more than a scintilla' " of evidence supporting the claim. *Wilkins v. Eaton Corp.*, 790 F.2d 515, 522 (6th Cir.1986) (quoting *Brady v. Southern Railway Co.*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)). In determining whether the evidence was sufficient, the court may neither weigh the evidence, pass on the credibility of witnesses, nor substitute its judgment for that of the jury. Instead, the evidence must be viewed in the light most favorable to the party against whom the motion was made, drawing from that evidence all reasonable inferences in his favor. *Id; Morelock v. NCR Corp.*, 586 F.2d 1096, 1104 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

One way a plaintiff can establish a *prima facie* case of age discrimination is by demonstrating that: 1) he was a member of a protected class; 2) he was discharged; 3) he was qualified for the position; and 4) he was replaced by a younger person. *Wilkins*, 790 F.2d at 520. This is not, however, a test that should be applied blindly or mechanically in age discrimination cases. *Blackwell v. Sun Electric Corp.*, 696 F.2d

1176, 1179–80 (6th Cir.1983). The district court noted that Wagner had not presented evidence that a younger person replaced her but determined that she had produced sufficient statistical and circumstantial evidence to meet her *prima facie* burden. Proof of this nature is permitted under *Blackwell*, 696 F.2d at 1180.

Once a plaintiff has met the *prima facie* burden, the burden of production shifts to the employer to articulate a legitimate reason for the termination. *Id.* The burden then shifts back to the plaintiff who must show, by a preponderance of the evidence, that the articulated reason was pretextual or merely a " 'cover-up' for what was in truth a discriminatory purpose." *Wilkins*, 790 F.2d at 521 (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 (1st Cir.1979)). The ultimate question in an age discrimination action is whether age was a determining factor in the employment decision. *Blackwell*, 696 F.2d at 1180.

Stop–N–Go's asserted reason for Wagner's termination was her violation of the company's bank deposit rule. It also argues that even if she were not dismissed for this violation, she would have been dismissed a few days later because all employees of Store 551 had been either laid off or fired. The district court acknowledged Wagner's proffered evidence as an attempt to show Stop–N–Go's reason for terminating her because of the bank deposit rule violations was pretext. It found, however, that the undisputed facts showed that Stop–N–Go "fired every employee of the store in question within the space of six days." The combination of both facts, the district court held, showed that age had nothing to do with the termination.

First, there is a problem with whether the district court should have viewed both facts as Stop–N–Go's justification for Wagner's dismissal. Stop–N–Go's representatives testified unequivocally that Wagner was dismissed for violating the bank deposit rule; they did not testify that she was terminated because of the cash shortages at Store 551. Rather, they testified that she *would* have been terminated a few days later as were all the other employees

of the store. Even if we assume that the latter reason is true, there is a question whether the district court may disregard the offers of proof attempting to show the defendant's stated reason for discharge was pretextual and grant a directed verdict based in part on a hypothetical situation. The real undisputed fact is that Wagner was terminated because of the bank deposit rule. She may have been discharged a few days later for the cash shortages but that never happened. Since that situation never developed, it can only be viewed in hypothetical terms. Stop–N–Go argued that she was terminated for violating the bank deposit rule and the inquiry should be whether age discrimination was a determining factor in her termination for violating the rule.

Once it is established, however, that violation of the bank deposit rule is the reason for discharge, then it must be determined whether the district court properly took the issue of age discrimination from the jury. In other words, was there a jury question on whether Stop–N–Go's reason was a pretext for discrimination.

The facts tend to indicate that this case should have been submitted to the jury. First, there was not a clear company policy that allowing a non-employee to make bank deposits was grounds for termination. The rule simply states that termination is the penalty if the deposit is not made. No other employee had ever been terminated for violating that rule. There was even testimony that Arnett saw Wagner's husband returning to the store with empty bank bags on a number of occasions. This fact does not prove that Arnett knew that Wagner's husband was making the bank deposits, but it could be viewed as a tacit approval by Arnett of that practice.

Viewed in isolation, the above facts do not create an inference of age discrimination; nevertheless they must be considered along with other facts. There was testimony that at a March 22, 1983 manager's meeting, Ira Royster stated "that all of us managers should get rid of older employees." There was also testimony by a former manager who stated that Arnett's successor, Becky Able, told her to "set older employees up" to get rid of them. Stop–N–Go argues that these statement are not relevant to Wagner's case because she had already been discharged. We do not agree. Royster was the district manager when Wagner was employed and he admitted giving instructions to Arnett to fire Wagner. The state of mind of Stop–N–Go's manager one week after the discharge is not too remote in time and could be probative of his motives in having Wagner dismissed. Able's statement, although not as probative on the issue as Royster's, could still be interpreted as reflective of the general attitude of the Stop–N–Go hierarchy.

There was evidence submitted of Stop–N–Go supervisory employees referring to older employees as "old bitches" and "old bags." The district court dismissed these remarks as too much a part of everyday vernacular to be probative of age discrimination. Further, he concluded that none of the remarks were directed at Wagner so they had no probative value. We agree with the district court that these remarks, when viewed in isolation, are not probative of age discrimination. However, such remarks should not always be discounted lightly depending on the context in which they are made.

Another factual dispute exists over whether Wagner was fired or suspended on March 15. She testified that Arnett informed her that she was being placed on suspension. Further, she testified that Arnett's replacement, Becky Able, told her on March 24 that she was still on suspension. She claims that she was not aware of her termination until May 1. The only probative value in this testimony is to show that Stop–N–Go did not decide to terminate her until after the manager's meeting when Royster purportedly stated his desire to get rid of older workers. Therefore, a jury could read Royster's statement to fire older employees as also being directed at Wagner.

Viewed separately, none of the above facts should have gotten Wagner past a directed verdict. But we are not convinced that by viewing the admitted evidence as a

whole, a jury could only have come to one conclusion.

The district court's order granting the defendant's motion for directed verdict is therefore REVERSED and this case is REMANDED for further proceedings.