**Ned WILKINS, Plaintiff-Appellee,**

v.

**The EATON CORPORATION, Defendant-Appellant.**

No. 84–3931.

United States Court of Appeals, Sixth Circuit.

Argued March 14, 1986.

Decided May 13, 1986.

Rehearing Denied Aug. 4, 1986.

Alan N. Hirth (argued), Nancy J. Herbst, Cleveland, Ohio, for Eaton Corp.

Robert F. Belovich (argued), Parma, Ohio, Robert S. Belovich, for plaintiff-appellee.

Before ENGEL, CONTIE and MIL-BURN, Circuit Judges.

---

1. Wilkins is a self-taught computer programmer.

CONTIE, Circuit Judge.

The defendant-appellant, Eaton Corporation (Eaton), appeals from the district court's denial of its motion for judgment notwithstanding the verdict as well as the court's ruling on evidentiary matters. The jury had returned a verdict for plaintiff-appellee, Ned Wilkins, finding that Eaton had discriminated against Wilkins on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, and in willful violation of the ADEA.

## I.

On February 27, 1981, Ned Wilkins was fired by Eaton Corporation. Wilkins had been employed since July 16, 1968 as a pilot in Eaton's Flight Operations. At the time of his termination, Wilkins was 51 years of age.

Wilkins began flying at the age of 16. When he was hired by Eaton in 1968, he was moved to Kalamazoo, Michigan where he flew a Cessna 411. When Eaton began using a Lear Jet aircraft, Wilkins was relocated to Cleveland, Ohio. Wilkins was trained and qualified to fly the new aircraft. He was an Assistant Chief Pilot from 1972 to 1980 and trained other Eaton pilots in the operation of Lear Jets. Throughout his flying career, he had an exemplary safety record and received very high performance ratings from his superiors. In addition to his piloting abilities, Wilkins developed a temperature control system for the Lear Jet, wrote a computer program [1] for scheduling aircraft trips and crew assignments, and helped service and maintain the automatic pilots.

During the 1970s, Eaton's Flight Operations expanded and in 1979 there were some management changes. In September 1979, Eaton retained a consulting firm, Aviation Consultants, Inc., to evaluate and make recommendations concerning the Flight Operations. Aviation Consultants issued a report in January 1980 which recommended several changes, most impor-

tant of which was the development of a standardized flight checklist. A checklist is a list of operations to be performed in an aircraft and is supposedly designed for safety purposes.

Pursuant to another recommendation of Aviation Consultants, the Flight Operations was reorganized. A new management position was created, Flight Manager, which was filled by Mr. Doug Collier. Mr. Greg Kuta became the new Chief Pilot, a position directly under the Flight Manager, af-. ter the previous Chief Pilot retired. The plaintiff was not considered for the position of Flight Manager, being told he was a "very negative person," and he was not offered the position of Chief Pilot despite his interest in that position. Wilkins was also "demoted" during the same time period from Assistant Chief Pilot to Captain Pilot when Eaton decided to send all pilots to safety school. By sending pilots to safety school, the need for an Assistant Chief Pilot to perform various duties was eliminated.

Shortly after Kuta's appointment, Eaton implemented a policy whereby the management would designate a "Trip Captain" for each flight, who would then designate a pilot-in-command for that flight. During one of Wilkins' scheduled flights, a younger, less experienced pilot was designated as Trip Captain. As a result, Wilkins refused to fly and he was temporarily suspended from piloting duties by Kuta. After discussions with management, Wilkins was permitted to present his grievances in writing,[2] and thereafter Eaton announced that the senior pilot would be pilot-in-command on all future flights.

In August 1980, Kuta began developing a flight checklist by soliciting advice from several sources. In October 1980, Kuta asked Wilkins to use the new checklist in a simulator and to report his impression to Kuta. Wilkins informed Kuta that the checklist was too lengthy. Kuta responded that use of the checklist would be mandatory for all pilots. This fact was later an-

nounced to all pilots at a pilot meeting which Wilkins attended.

On February 9, 1981, Wilkins flew to Middletown, Delaware. Wilkins noticed that his co-pilot was occupied with the checklist rather than helping him sight other airplanes. Upon his return to Cleveland, Wilkins told Kuta that the checklist compromised safety and that he did not intend to use it. Kuta stated that all pilots were required to use the checklist in order to fly for Eaton, and Wilkins responded that he might have to work elsewhere.

On February 26, 1981, Wilkins went on a round trip flight to New York City and when he returned he was confronted by Kuta regarding the checklist. Wilkins stated he had not used the checklist, and intended to never use the checklist because he believed safety would be compromised. Kuta told him that he would lose his job and proceeded to remove Wilkins from a scheduled flight on the following day. Wilkins testified at trial that he "could not accept the conditions that [Kuta] attached to continued flying," and when Kuta called him on February 27th to discuss his intentions, Wilkins stated he would not fly if required to use the checklist. Wilkins also stated that he would like to draft a memo as he had been allowed to do in regards to his disagreement with the Trip Captain policy. However, he was called on the following Monday, March 2, 1981, and again was informed that his refusal to use the checklist would result in termination. Wilkins again refused to fly under those conditions, and proceeded to finish his memo for consideration by management. His termination was effective February 27, 1981. Subsequent to his termination Mr. Terry Ross was promoted to Captain Pilot. Ross was 27 years old.

Wilkins filed a complaint on February 26, 1982, alleging that Eaton had fired him because of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.* He re-

---

**2.** Wilkins primarily argued that the management's rule was illogical because it placed final authority with the less experienced pilot and was psychologically damaging to senior pilots.

quested damages and reinstatement. The case was tried before a jury.

In support of his claim of age discrimination, Wilkins testified that he believed the flight checklist was discriminatory because it was biased to the younger, inexperienced pilot by virtue of its completeness and requirement for rigorous execution.

And it was biased against the older, more experienced pilots by requiring them to divert their attention to a simple housekeeping chore and take their attention from more important items which would be observing for other traffic, other airplanes in the sky, unusual conditions, wherein true flight safety would lie.

On cross-examination, Wilkins agreed that Eaton had probably believed the checklist would increase safety. Wilkins also testified that he was not aware of anyone else who had told Kuta that they would not use the checklist. He also wrote a computer program which generated two graphs, which were then admitted into evidence. One graph showed the number of pilots, while the other depicted the average age of active pilots over a several year period. The data used to generate the graphs consisted of each pilot's date of birth, date of hire and date that the individual became an inactive pilot by virtue of termination, transfer, retirement or otherwise. Wilkins testified that this graph showed that the average age of active pilots had been decreasing around the time he was terminated.

Mr. Terry Saylor also testified on behalf of Wilkins. Saylor was a pilot for Eaton at the time Wilkins was fired. At that time he was 33 years of age. Saylor testified that he, too, did not use the checklist despite knowing it was mandatory, believing it to be unsafe and inefficient. He stated that he believed the checklist was biased against older and more experienced pilots although he did not state his reasons for that conclusion. He also gave the following testimony:

I had been out on a trip [on February 26, 1981], and when I returned I was talking with Greg Kuta who was chief pilot at that time. And we got into a discussion about the checklist that we were using at that point.

At that time there was a discussion about me not using it. I didn't agree with the checklist, and we had a long discussion about it.

When asked if Mr. Kuta knew that Saylor was not using the checklist, Saylor stated, "Somebody had been talking to him about it. . . ." When asked a second time whether Kuta knew on February 26, 1981 that he did not use the checklist, Saylor responded, "If somebody else had told him." Saylor was not disciplined by Kuta, but was told to "kind of bear with him at that point, that there was going to be some revisions made to the checklist." Wilkins argued that Saylor's testimony showed that he had been treated differently than Saylor on the basis of age. Eaton attempted to introduce into evidence a letter written by Saylor to management which stated, *inter alia,* that Saylor disagreed with the checklist, but nonetheless followed company policy. The district court did not permit this into evidence, reasoning that it was a prior inconsistent statement and Eaton had failed to lay the proper foundation.

Eaton presented the following evidence. Mr. Sadler, who had overall responsibility for Flight Operations, testified that Wilkins was fired because he "elected not to comply with one of our regulations concerning the operations of our Flight Department" and that age was never considered. Mr. Campbell, Manager of Employee Relations for Eaton, testified that Eaton usually did not terminate employees immediately, giving them three months to turn their behavior around. He stated that this procedure was not used with Wilkins, however, for the following reasons:

[H]e refused to follow the checklist, which was a procedure in place, and he said he would not, and was not, and was not working hand in hand with the manager at that time, and he said he would not follow the checklist and would not fly the airplane as long as the checklist was in place, and he walked off the job, and

he was asked again if he would come back, and he refused.

He testified that age played no factor in Wilkins' dismissal.

Kuta testified that Wilkins refused to use the checklist and was informed that termination could result from such refusal. He also testified that Saylor had never outright refused to use the checklist.

The case was submitted to the jury over Eaton's motion for directed verdict. The jury returned a verdict for Wilkins awarding $228,116, representing $114,083 in back pay, and the same amount for a willful violation of the ADEA. The district court also ordered reinstatement and pension fund contribution. The judgment was later amended in order to subtract prejudgment interest, thereby totalling $194,330.

Eaton filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The district court denied both of these motions. In denying Eaton's motion for judgment notwithstanding the verdict, the court reasoned that Wilkins had established a prima facie case of age discrimination, and that he had presented adequate evidence to rebut Eaton's articulated reason for dismissing him. Specifically, the court held that the jury could reasonably conclude, based on a permitted inference that the checklist was not enforced uniformly, that Eaton's articulated reason for firing Wilkins was merely a pretext for age discrimination. The court next concluded that the graph was properly admitted into evidence and that Eaton's arguments merely went to the weight to be given that evidence. Further, since Eaton failed to introduce Saylor's letter during Saylor's testimony, the letter was properly not admitted because the opposing party would not have had an opportunity to question Saylor regarding his prior inconsistent

statement. Eaton's motion for a new trial was therefore denied.

Eaton argues on appeal that the district court erred in denying its motion for judgment notwithstanding the verdict, and again challenges certain evidentiary rulings. For the reasons set forth below, we reverse the judgment of the district court and remand this case for entry of judgment notwithstanding the verdict in favor of the appellant.

## II.

■ In an age discrimination case under the ADEA, the plaintiff carries the ultimate burden of persuasion to establish by a preponderance of the evidence that, as an individual protected by the statute, he was dismissed, demoted, or not hired because of his age. *Rose v. National Cash Register Corp.*, 703 F.2d 225, 227 (6th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *Laugesen v. Anaconda Co.*, 510 F.2d 307, 313 (6th Cir.1975). Although there may be more than one reason for an employee's discharge, a plaintiff can prevail if he establishes that " 'but for' his employer's motive to discriminate against him because of his age, he would not have been discharged." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir.1979).

■ To make out a prima facie case of age discrimination, thereby avoiding a directed verdict at the close of plaintiff's evidence, a plaintiff must demonstrate that:

(1) he was a member of a protected class; (2) he was discharged; (3) he was qualified for the position; and (4) he was replaced by a younger person.

*Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 99 (6th Cir.1982). *See also Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1180 n. 4 (6th Cir.1983).[3] We agree

---

**3.** In *Blackwell,* the court stated that "the strict evidentiary approach used in racial discrimination cases should not be blindly applied in an age discrimination case." 696 F.2d at 1179. Other cases have also noted that a modification of the factors set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) should not be ap-

plied mechanically. *See La Grant v. Gulf & Western Manufacturing Co.,* 748 F.2d 1087, 1090 (6th Cir.1984); *Laugesen v. Anaconda Co.,* 510 F.2d 307, 313 n. 4 (6th Cir.1975). However, we do not believe that the district court abused its discretion in relying on the *Ackerman* factors to determine whether Wilkins had made out a prima facie case.

with the district court that Wilkins carried his burden of establishing a prima facie case. It is clear that Wilkins, being 51 years old, was a member of a protected class at the time of discharge. He therefore satisfied the first two criteria.

Eaton argues that by virtue of his insubordination, Wilkins was not "qualified" for his position as a pilot. We find this argument unpersuasive. To be "qualified" for a position means that the individual "was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Loeb*, 600 F.2d at 1013. There is no indication in the record that Wilkins was anything but a superb pilot. Although Wilkins' refusal to fly may serve as a legitimate reason for dismissal, we do not believe that speaks to his ability to fly an airplane.

Eaton also argues that Wilkins was not replaced by a younger individual. Shortly after Wilkins was discharged, a 27 year old co-pilot, Terry Ross, was promoted to Captain Pilot. Wilkins identified Ross as the individual who took over his former duties. Although it is natural, to an extent, for older employees to be replaced by younger employees who are moving up the employment ladder, *see Laugesen v. Anaconda Co.*, 510 F.2d at 313 n. 4, we do not believe that fact precludes the establishment of a prima facie case in this situation. Ross was next in line for being promoted to Captain Pilot, but Wilkins also provided some evidence that the average age of active pilots was decreasing. We believe that the combination of these factors adequately satisfies the last element in *Ackerman.* Therefore, the district court did not err by denying Eaton's motion for directed verdict at the close of plaintiff's case.

Eaton clearly satisfied its production burden by coming forth with a legitimate nondiscriminatory reason for Wilkins' discharge. The evidence is uncontradicted that Wilkins was not using the checklist when told to do so and, more importantly, he informed his superior, Greg Kuta, that he would not fly if he were required to use the checklist. Wilkins' account of the events leading to his discharge agree with the accounts of Eaton's witnesses. Further, all of Eaton's witnesses testified that Wilkins' outright refusal to use the checklist was the basis for his dismissal and that his age was never considered.

Once an employer has articulated a legitimate reason for its action, the plaintiff has the burden of showing, by a preponderance of the evidence, that the stated reason "is a mere pretext or 'cover-up' for what was in truth a discriminatory purpose." *Loeb*, 600 F.2d at 1012. The factfinder may not focus on the soundness of the employer's business judgment, *see id.* at 1012 n. 6; *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir. 1980) (per curiam), *cert. denied*, 450 U.S. 959 (1981); *Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1179 (6th Cir.1983), since the ADEA was only intended "to protect the older worker from arbitrary classifications on the basis of age...." *Blackwell*, 696 F.2d at 1179. The ADEA did not change the fact that an " 'employer may make a subjective judgment to discharge an employee *for any reason that is not discriminatory.*' " *Ackerman*, 670 F.2d at 70 (quoting *Walter v. KFGO Radio*, 518 F.Supp. 1309, 1314 (D.N.D.1981)) (emphasis added). In other words, when an employer meets its burden of articulating a legitimate nondiscriminatory reason for discharge, the presumption of discrimination created by establishing a prima facie case is destroyed. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The factual inquiry encompassing the ultimate question in the case then " 'proceeds to a new level of specificity.' " *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482 (quoting *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1095). *See also Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 239 (4th Cir.1982).

■ The dispositive motivational issue requires a consideration of the two opposing reasons for discharge to determine whether Wilkins' discharge would not have occurred "but for defendant's motive to discriminate against him because of his age." *Lovelace,* 681 F.2d at 240. The burden of producing evidence of "pretext" essentially merges with the burden of persuasion, which always lies with the plaintiff. If the plaintiff has failed to carry this ultimate burden of production, the court is compelled to grant judgment for the defendant upon a proper motion for directed verdict or judgment notwithstanding the verdict. *Id.* The question before the court is whether the plaintiff produced sufficient evidence for this case to be submitted to a jury and for the jury verdict to be upheld.

■ For a case to be properly submitted to the jury, there must be "more than a scintilla" of evidence supporting the claim. *Brady v. Southern Railway Co.,* 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed.2d 239 (1943).

> When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict the court should determine the proceeding by non-suit, directed verdict ... or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims.

*Id.* at 479–80, 64 S.Ct. at 234. *See also Morelock v. NCR Corp.,* 586 F.2d 1096, 1104 & n. 10 (6th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); *Kerwood v. Mortgage Bankers Ass'n of America, Inc.,* 494 F.Supp. 1298 (D.D.C.1980). In determining whether the evidence is sufficient to be sent to the jury or to support a jury verdict, the evidence, and reasonable inferences therefrom, is to be viewed in the light most favorable to the non-moving party and the court must not consider the credibility of witnesses nor weigh the evidence. *Morelock,* 586 F.2d at

1104. To do otherwise is to substitute the court's opinion for that of the jury. *Id.*

■ In the case at bar, we believe that the evidence simply cannot support a conclusion that the Eaton Corporation fired Wilkins on the basis of his age. Wilkins principally relied on the fact that Saylor, who was younger than Wilkins, was not fired when he did not use the checklist. We are totally unpersuaded, however, that Saylor and Wilkins acted in the same manner. Saylor never informed the Eaton management that he refused to use the checklist and would not fly if required to use the checklist. Wilkins even testified that, to the best of his knowledge, he was the only pilot who informed management that he simply would not fly if required to adhere to the company policy. This is significantly different conduct than Saylor's. In fact, this was the second time Wilkins refused to work unless management abandoned a particular policy and agreed with his point of view. There was no evidence at all that Eaton adopted this checklist as a pretext for discriminating against Wilkins; even Wilkins testified that Eaton management probably thought the checklist would increase the safety of flights.

Nor are we persuaded by the argument that the checklist itself was discriminatory. The testimony indicates that Wilkins and Saylor believed the checklist discriminated against older and more experienced pilots because the checklist required them to spend time on housekeeping chores which should not be occupying their time. Since all pilots were required to use the checklist, there was no classification based on age or experience. The fact that pilots were essentially required to "waste time" is not evidence of age discrimination but is merely indicative of whether Eaton had adopted a wise policy. The reasons why Wilkins found the checklist to be inefficient and unsafe are the same reasons he felt it to be discriminatory. These arguments only reflect the value in Wilkins' refusal to abide by the checklist, and perhaps Eaton's poor judgment in dismissing Wilkins for this

infraction, but are certainly not evidence of discriminatory intent.[4]

Similarly, the graph prepared by Wilkins does not help him in reaching his ultimate production and persuasion burdens. The graph shows that the average age of pilots decreased during a certain period of time, but the graph completely lacks specificity. For instance, the decrease in age could have resulted because several pilots retired or voluntarily transferred to non-flying positions, requiring younger pilots to be hired. Although the graph arguably supports an inference of discrimination when establishing a prima facie case, it is insufficient circumstantial evidence to support the jury verdict in this case. Even when combined with the other pieces of evidence offered by the plaintiff, the result is a mere scintilla of evidence from which no rational jury could have found a violation of the ADEA. *See Merkel v. Scovill, Inc.,* 787 F.2d 174, 178 (6th Cir.1986) (jury could not reasonably find that age was a determining factor in discharge of two employees).

The plaintiff has the burden of establishing by a preponderance of the evidence that age was the determining factor in his discharge. Wilkins did not meet this burden. We believe that the jury verdict resulted from mere speculation, and perhaps a dislike of Eaton's business judgment. However, the fact that a talented pilot was fired over a checklist which had questionable value cannot, by itself, form the basis of a finding of age discrimination. There must be evidence of discriminatory purpose, *Ackerman,* 670 F.2d at 70, and there must be evidence from which a reasonable jury could conclude that age was the *more likely* reason for Wilkins' discharge, rather than merely a speculative possibility. *See Lovelace,* 681 F.2d at 241–42; *Sahadi v. Reynolds Chemical,* 636 F.2d 1116 (6th

Cir.1980) (per curiam). We are convinced that the evidence "does not suffice to support as a reasonable probability the inference that but for claimant's age he would not have been discharged." *Lovelace,* 681 F.2d at 243. Eaton's motion for judgment notwithstanding the verdict, therefore, should have been granted. Because of our disposition of this case, we do not reach the other issues raised by the appellant.

Accordingly, the judgment of the district court is REVERSED and this case is REMANDED with instructions to enter judgment notwithstanding the verdict in favor of the appellant.

ENGEL, Circuit Judge, concurring.

I concur in order to register my continuing uncertainty whether a prima facie case of age discrimination is made out by application of the four-step rule borrowed from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The majority opinion here, as did the opinion in *Blackwell v. Sun Electric Corp.,* 696 F.2d 1176, 1179 (6th Cir.1983), continues to recognize the logic which I first expressed in *Laugesen v. Anaconda Co.,* 510 F.2d 307, 312–13 (6th Cir.1975). The majority holds, however, that a prima facie case sufficient to avoid a directed verdict is made out by the plaintiff simply by demonstrating that he (1) was a member of the protected class; (2) was discharged; (3) was qualified for the position; and (4) was replaced by a younger person. Ultimately, I believe this bare bones application of the *McDonnell Douglas* formula will in fact create the dangers discussed in *Blackwell,* 696 F.2d at 1179, and other like cases.

In my opinion, the facts here are much closer to those which, in *Sahadi v. Reyn-*

---

**4.** Similarly, Wilkins' argument that the previously implemented Trip Captain policy was evidence of discriminatory motive is unavailing. First, the mere assertion in conclusory terms that the policy discriminated on the basis of age does not establish that it was, in fact, discriminatory. Wilkins primarily argued that the rule was bad for morale and the more experienced pilot should be in charge. Not only does experience not always correspond with age, but there was also testimony as to the legitimacy of this

policy. Further, there was no indication that younger pilots would always be the Trip Captain or pilot-in-command on every flight. The fact that Eaton abandoned this policy upon Wilkins' request is equally probative of the fact that Eaton wished to keep experienced pilots happy. We believe, therefore, that this evidence cannot form the basis of a finding of age discrimination concerning a discharge occurring at a future time.

*olds Chemical,* 636 F.2d 1116 (6th Cir. 1980), led Judge Guy in the district court and our court on appeal to conclude that a prima facie case had not been made out even though it was arguable that a fifty-one year old employee had been laid off when his job was combined into the duties of a younger employee. The only arguable basis here for Mr. Wilkins' claim that he made out a prima facie case would be found, in my opinion, by his effort to introduce a graph showing that the average age of active pilots over a period of several years had declined. However, I do not understand this to be a pattern and practice suit and I do not believe that the evidence of those graphs was sufficient to add that extra ingredient of discrimination which I believe should be required in disparate treatment age cases and which would enable the court to point to evidence that the action complained of was "because of" the employee's age. At the same time, I recognize that the majority's decision is probably consistent with *Blackwell,* and if we are to conclude that a prima facie case was made out, at least to the extent that it might have resisted a motion for directed verdict, then I fully agree with the remainder of Judge Contie's opinion and, of course, with its result.