914 F.2d 1494
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Charles E. BERGMAN, Plaintiff-Appellee,
v.
BAILEY CONTROLS COMPANY, Defendant-Appellant.
 No. 89-3622.
 United States Court of Appeals, Sixth Circuit.
 Sept. 27, 1990.
 
 Before NATHANIEL R. JONES and ALAN E. NORRIS, Circuit Judges, and JARVIS, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant-appellant Bailey Controls Company ("Bailey") appeals the district court's denial of its motion for a judgment notwithstanding the verdict ("JNOV") in this age discrimination suit brought by Charles E. Bergman pursuant to the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. Sec. 623 et seq. We affirm.
 
 I.
 
 2
 Bailey is a subsidiary of the Babcock & Wilcox Company which manufactures and markets process controls systems. Its principal offices are located in Wickliffe, Ohio. Prior to his termination, Bergman had been employed by Bailey for 36 years, primarily in the company's Marketing Department. At the time of his termination, Bergman was sixty-two years old and worked as a Market Manager in the Process Marketing Group. That entity of the company marketed Bailey's process control systems.
 
 
 3
 In his latter capacity, Bergman was responsible for four markets, one of which was the water/waste water market. Bergman devoted an estimated forty percent of his time to this market. J.App. at 494. As a Market Manager, Bergman developed marketing plans and created packages of Bailey products tailored to customers' needs. He also assisted field representatives in concluding sales of Bailey products.
 
 
 4
 In September 1986, financial difficulties prompted Bailey to implement a reduction in force ("RIF"). In order to lay off seventy-three salaried workers from the company's Wickliffe facility, Bailey's President advised Larry Enterline, Marketing Department Vice President, that he would have to cut the department's salaried workforce by ten percent. The purported criteria Bailey used to make salaried layoff determinations were as follows. The company first sought to ascertain the positions, markets and sales territories which were most dispensable. It then evaluated the performances of the employees holding the positions targeted for elimination to determine whether they should be placed in another position. Where the latter step led to a "tie" between employees, seniority was used as a tiebreaker. In evaluating its employees' performances, Bailey's assessments were influenced by the results of a regularly conducted "forced peer ranking" in which Bailey supervisors ranked employees in the order of their contribution to their respective departments. Id. at 632.
 
 
 5
 With respect to its first criterion for making salaried layoff decisions, Larry Rice, Manager of the Marking Department's Process Group, determined that the water/waste water marketing position to which Bergman devoted substantial time should be eliminated because it was unprofitable. Larry Enterline agreed with Rice's assessment and recommended elimination to Bailey's President. This recommendation was ultimately adopted. However, despite the alleged unprofitability of the water/waste water market, Bailey continued to bid in this area both during and after the RIF. Id. at 106.
 
 
 6
 In assessing whether Bergman's performance warranted placing him in another position, Bailey claims it evaluated Bergman's recent employment history. In 1979, Bergman received a rating of seventy-two out of a possible 100, which was satisfactory. The appraisal noted that Bergman possessed superior knowledge of products and their applications, but it gave Bergman a low score of forty-five in the area of communications. Id. at 678. An appraisal covering the period from November 1980 to October 1981 gave Bergman largely negative evaluations in areas pertaining to interpersonal skills and an overall rating of 75/63. Id. at 653-54. In Bergman's next regularly scheduled appraisal, covering the period from July 1, 1983 to December 31, 1984, he received a rating of 82 or "excellent." Id. at 655. Enterline, then Bergman's immediate supervisor, was primarily responsible for this appraisal, which was completed in February 1985. Bergman was subsequently promoted to the position of Senior Industry Marketing Manager.
 
 
 7
 During the appraisal period covering December 1984 to December 1985, Larry Rice was Bergman's immediate supervisor. Rice gave Bergman a sixty rating--"improvement needed"--for this period. This rating contrasted markedly to Rice's assessment of Bergman in a thirty-five year anniversary appraisal which covered the first three and a half months of 1985. In that appraisal, Rice termed Bergman's performance "excellent." Id. at 362-63. Based on the foregoing appraisals, Bailey concluded that Bergman was not an appropriate candidate for placement in an another company position. On September 19, 1986, Bailey notified Bergman of his permanent layoff.
 
 
 8
 Bergman maintains Rice's decision to recommend him for termination was influenced by ageism. In the summer of 1985 when Bergman had assumed the position of Senior Industry Marketing Manager, Rice failed to inform the Bailey employees whom Bergman was to supervise in his new position that they were to begin reporting to Bergman. Id. at 331. Bailey's policy was to announce promotions to all Bailey workers who would be directly affected by them. Id. at 305. Rice's refusal to follow this procedure made Bergman's relationship with his subordinates awkward and his supervisory duties more difficult.
 
 
 9
 On August 26, 1986, approximately three weeks before Bergman's termination, Rice assigned Bergman to work solely in the water/waste water market and redistributed his work in other areas to younger employees. Id. at 671. Martin Haas, age thirty-three, was hired by Bailey in late August, two weeks prior to the RIF. At that time, Haas took over Bergman's duties in the metals and ceramics market; he continued these responsibilities after Bergman's termination. John Glowe, age forty-one, was assigned Bergman's work in the federal market. Id. at 671. Subsequent to the RIF, Ted Gorrie assumed Bergman's responsibilities for work on an international fuel cells (IFC) project, and Doug Deery, age twenty-five, took over Bergman's responsibilities for the federal market.
 
 
 10
 In addition to the relinquishment of his responsibilities and their reassignment to younger workers, Bergman notes that Rice had referred him as an "old guy" on three occasions and had announced after the RIF that the Process Marketing Group would be restructured with new, younger workers.
 
 
 11
 Although Bergman was deemed unsuitable to be offered another position within Bailey under the company's formal procedure for making salaried layoff decisions, on October 3, 1986, during Bergman's two-week notice period, Bailey offered Bergman a position as a Senior Instructor. The position involved training Bailey customers in the use of Bailey computer consoles. The salary for this position was the same as Bergman's salary as a Marketing Manager. However, the "grade level" for a Senior Instructor position was ten as compared to sixteen for Marketing Manager. An employee's grade level affects the degree of supervisory authority he possesses. A Senior Instructor could not achieve a grade level higher than ten. Id. at 386-87. Furthermore, the Senior Instructor position entailed substantially more travel than the Marketing Manager position. Bergman declined the Senior Instructor position and applied for his early retirement pension on October 31, 1986.
 
 
 12
 On July 1, 1987, Bergman filed the instant action alleging unlawful age discrimination in violation of the ADEA, 29 U.S.C. Sec. 623 et seq. in the United States District Court for the Northern District of Ohio. On February 16, 1988, Bailey moved for summary judgment, and this motion was denied. The case proceeded to trial. On October 14, 1988, a jury found in favor of Bergman. The district court thereafter denied Bailey's motions for JNOV or, in the alternative, for a new trial. This timely appeal followed.
 
 II.
 
 13
 Bailey appeals the district court's denials of summary judgment, a directed verdict and a JNOV. The applicable standards of review are the same for each of these motions. Although the standard of review of a court's denial of a motion for summary judgment is "abuse of discretion," see Pinney Dock and Transport Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.) cert. denied., 109 S.Ct. 196 (1988), the inquiry upon the filing of a motion for summary judgment is substantially the same as the inquiry attendant to a motion for a directed verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A verdict should be directed, or summary judgment granted, "if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." Id. at 250-51 (citations omitted). A district court's denial of a motion for JNOV is reviewed by the same standard as its denial of a directed verdict. Calhoun v. Honda Motor Co., LTD., 738 F.2d 126, 129 (6th Cir.1984).
 
 
 14
 A. Bergman's Prima Facie Case.
 
 
 15
 An ADEA plaintiff avoids a directed verdict if he makes out a prima facie case of age discrimination. Wilkins v. The Eaton Corp., 790 F.2d 515, 520 (6th Cir.1986). Generally, a prima facie case of age discrimination is established where the plaintiff demonstrates that: " '(1) he was a member of a protected class; (2) he was discharged; (3) he was qualified for the position; and (4) he was replaced by a younger person.' " Id. (citation omitted). These criteria, however, are not ironclad, see id. at n. 3, and it is sufficient if the plaintiff's evidence creates an inference that he was terminated due to his age. See Rose v. National Cash Register Corp., 703 F.2d 225, 227 (6th Cir.), cert. denied, 464 U.S. 939 (1983). Where an ADEA plaintiff's termination takes place during a RIF, the plaintiff must present "additional direct, circumstantial, or statistical evidence that age was a factor in his termination." McMahon v. Libbey-Owens-Ford Co., 870 F.2d 1073, 1077 (6th Cir.1989) (per curiam).
 
 1.
 
 16
 Bailey's principal argument regarding Bergman's prima facie case is that Bergman failed to prove that he was involuntarily discharged. Bailey contends that Bergman voluntarily left Bailey's employ because he did not want the Senior Instructor position offered him. As such, Bailey maintains that Bergman must demonstrate that he was constructively discharged. "A constructive discharge exists if 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " Yates v. AVCO Corp., 819 F.2d 630, 636-37 (6th Cir.1987) (citation omitted).
 
 
 17
 The district court refused to instruct the jury on constructive discharge because it concluded that Bergman was actually discharged on September 19, 1986, and the facts did not support a finding that Bergman's refusal to accept the Senior Instructor position rendered his discharge voluntary. J.App. at 33. A trial court may sua sponte direct a verdict where the evidence is insufficient to present a jury question. See Best v. District of Columbia, 291 U.S. 411, 415 (1934). The district court's determination that Bergman was actually and involuntarily discharged on September 19, 1986 is supported by the record. On September 19, 1986, Bergman was informed that he was being permanently laid off. Not wanting to leave the company's premises immediately, Bergman asked for and was given permission to stay on during his two-week notice period in order to consider taking early retirement and to wrap up pending business matters. J.App. at 423. Bailey gave Bergman no indication that his discharge was anything other than a permanent, involuntary termination. Yet, in citing cases such as Gomez v. Great Lakes Steel Div. Nat. Steel Corp., 803 F.2d 250, 252 (6th Cir.1986); Caslin v. General Electric Corp., 696 F.2d 45, 46 (6th Cir.1982); Williams v. Caterpillar Tractor Company, 770 F.2d 47, 49 (6th Cir.1985); and Geisler v. Folsom, 735 F.2d 991, 993 (6th Cir.1984), Bailey attempts to analogize Bergman's September 19 termination notice to a demotion, because he was later offered another position within the company. Bailey cites the latter authorities for the proposition that "plaintiffs whose terminations result from their refusals to accept transfers or demotions [must] prove they were constructively discharged." Brief for Defendant-Appellant at 22. The cases cited, however, are inapposite because they involve employees who resigned their positions in the belief that their reassignment to new positions or failure to receive promotions in their companies constituted a discriminatory demotion and/or an intolerable employment situation.
 
 
 18
 In Bergman's case, the September 19 termination was an unqualified permanent discharge. It was not a notice of transfer, demotion, or denial of promotion. Indeed, by including Bergman in the RIF, Bailey had determined that Bergman's past performance had made him ineligible to be placed in another position within the company. In determining when the statute of limitations begins to run in cases under the ADEA, this court has held that "it is the date that the employee learns that he will be terminated and not the actual date of termination" which begins the limitations period. Baer v. R & F Coal Co., 782 F.2d 600, 602 (6th Cir.1986) (per curiam) (emphasis added). Bailey advances no reason, and we see none, why Baer's holding should not also apply to the instant case. Failure to apply Baer would create the anomaly of permitting an employer to transform an actual discharge into a constructive discharge merely by offering an employee a position within the company after the employee's termination has already been announced. This would unduly increase the plaintiff's burden in establishing a prima facie case, because the requirements for a finding of constructive discharge are clearly more onerous than those for a finding of actual discharge.
 
 
 19
 In Shore v. Federal Express Corp., 777 F.2d 1155 (6th Cir.1985), Shore, a female employee, was terminated after arguing with a supervisor with whom she had previously had an intimate relationship. The decision to discharge Shore was made entirely based on her supervisor's story, and no action was taken against the supervisor. After her termination, Shore was promised a comparable position within the company. For four and a half months following Shore's termination, Federal Express permitted Shore to receive full pay while performing no other duties besides searching for a comparable position within Federal Express. Shore was offered two positions, Hazardous Materials Specialist and Quality Assurance Auditor, which she declined. Her refusal to accept the second of these two positions resulted in her termination from Federal Express' payroll. Like Bailey's argument in the instant case, Federal Express maintained that Shore was terminated because she refused to accept the position offered her. In affirming the district court's finding of unlawful sex discrimination, however, this court agreed with the district court that Federal Express' proffered reasons for Shore's dismissal was an "after-the-fact" attempt to justify Shore's initial unlawful discharge. Id. at 1157. Shore teaches that subsequent job offers do not obliterate the fact of an initial termination or legitimate the discriminatory reasons for such termination.
 
 
 20
 Bailey cites this court's unpublished disposition in O'Brien v. Frito-Lay, Inc., No. 88-2125 (6th Cir. September 26, 1989) (1989 U.S.App. Lexis 14681), in support of its argument that it was free to reconsider its initial discharge decision by offering Bergman another position within the company. This argument might be persuasive were it not for Bailey's own admission in its appellate brief that "there was nothing about Bergman's skills or performance that justified retaining him in some other position." Brief for Defendant-Appellant at 5. The decision to terminate Bergman was made through use of a formal procedure. Rice's nomination of Bergman for permanent discharge was ratified by Rice's superior, Larry Enterline. J.App. at 635. By the time Bergman was informed of his termination, that decision had been thoroughly considered and had the imprimatur of finality. Indeed, Enterline testified that the deadline for completion of the RIF was September 19, the day on which Bergman received notice. Id. at 630. By contrast to the facts in the instant case, the plaintiff in O'Brien was abruptly "discharged" by his immediate supervisor, John Swisher, who apparently did not have final authority to make such a discharge. Thus, in a subsequent meeting, Swisher's supervisor offered plaintiff the option of a ninety-day probation period, which the plaintiff declined. Under these circumstances, this court held that the supervisor's actions in the subsequent meeting repudiated the plaintiff's discharge and that the plaintiff would have to show constructive discharge to establish a prima facie case of wrongful termination. No. 88-2125, slip op. at 2-3. Bailey tries to have it both ways in boasting of the thoroughness of its procedures for making permanent layoff determinations and then downplaying the importance of this procedure by showing it gave Bergman an option to continue working. The district court was certainly not required to give the jury a constructive discharge instruction in light of Bailey's contradictory arguments. We accordingly affirm the district court's determination that Bailey did not raise a jury question regarding constructive discharge because Bergman was actually terminated on September 19, 1986.
 
 2.
 
 21
 Bailey also contends that Bergman did not establish a prima facie case because his evidence failed to create an inference that he was terminated because of his age. We strongly disagree. Initially, Bergman demonstrated that he was qualified for the position he held. Although Bailey focuses on Rice's appraisal of Bergman in which he gave Bergman's performance an overall rating of sixty, there was substantial evidence that Rice's evaluation was inaccurate and unreasonable. First, this extremely negative appraisal, covering the period from December 1984 to December 1985, diverged inexplicably from Rice's assessment of Bergman's performance during the first three and a half months of 1985 (Bergman's thirty-five year anniversary appraisal). Second, although Rice purportedly believed Bergman's performance merited only a sixty rating, Rice continued to increase Bergman's responsibilities, permitting him to take on additional duties for the IFC project, in the metals and ceramics market and in the new federal market. J.App. at 364-65. Rice conceded at trial that his policy was not to give increased responsibility to Market Managers who were not performing well. Id. 363-64.
 
 
 22
 Rice also testified that the most important measurement of a Market Manager's performance is his profitability. Id. at 365. He then conceded that as of one month before the RIF, the markets in which Bergman worked were performing profitably. Id. at 366, 368. This evidence leaves little question that Bergman was qualified for the position he held. In light of Rice's acknowledgement that profitability was the most important measure of Bergman's performance, Bailey's focus in its appellate brief on Bergman's alleged personality deficiencies appears exaggerated. In any event, Bergman's alleged inflexibility did not render him unqualified. Cf. Wilkins, 790 F.2d at 521 (employee's insubordination, while possibly a reason for dismissal, does not in itself make employee unqualified for pilot's position).
 
 
 23
 Bergman also established as part of his prima facie case that younger employees assumed his duties upon his discharge. He thus met the fourth generally accepted criterion for the establishment of a prima facie case. Bergman's "additional evidence," necessary because his termination occurred during a RIF, consisted of: 1) Rice's age-related comments; 2) Rice's refusal to inform Bergman's subordinates of the scope of Bergman's supervision, as required by company policy; and 3) Bailey's false assertion that it was dismantling its water/waste water market. Because a reasonable juror could find that Bergman created an inference that age was a determining factor in his dismissal, we affirm the district court's denial of Bailey's motion for a directed verdict.
 
 B. Bergman's Evidence of Pretext
 
 24
 After a plaintiff has established a prima facie case of age discrimination, an employer must come forward with a legitimate, nondiscriminatory reason for the plaintiff's discharge. If this is accomplished, a plaintiff must show, by a preponderance of the evidence, that the employer's stated reason is a mere pretext for an actual discriminatory motivation. Id. A plaintiff's failure to establish pretext makes entry of a JNOV appropriate. A plaintiff may establish pretext:
 
 
 25
 (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the discharge, or (3) if they were factors, by showing they were jointly insufficient to motivate the discharge.
 
 
 26
 Chappell v. G.T.E. Products Corp., 803 F.2d 261, 266 (6th Cir.1986), cert. denied, 480 U.S. 919 (1987).
 
 
 27
 In the instant case, there was ample evidence of pretext to permit a reasonable juror to find in favor of Bergman. The two principal reasons given for including Bergman in the RIF were that Bailey was closing its water/waste water market and that Bergman's performance was lacking. However, the record reveals that Bailey continued in the water/waste market for a substantial period after Bergman's discharge. Furthermore, as discussed in relation to Bergman's prima facie case, Bailey's actions in increasing Bergman's responsibilities flatly contradict its assertion that Bergman's poor performance was the reason for his dismissal. Accordingly, we affirm the district court's denial of Bailey's JNOV motion.
 
 III.
 
 28
 Bailey finally contends that Bergman failed to mitigate his damages by rejecting the Senior Instructor position. "An ADEA plaintiff has a duty to mitigate damages by using reasonable care and diligence in seeking suitable alternative employment. The defendant bears the burden of showing failure to mitigate by establishing (1) that there were suitable positions available which the plaintiff could have discovered; and (2) that he failed to use reasonable care and diligence in seeking them out." Jackson v. Shell Oil Co., 702 F.2d 197, 201-02 (9th Cir.1983) (citations omitted). A "suitable" position is one which is substantially equivalent to the position from which the plaintiff was discharged. Id. at 202.
 
 
 29
 In response to a special interrogatory, the jury in the instant case found that the Senior Instructor position offered Bergman was not substantially equivalent to Market Manager. Its finding is reasonable in light of the evidence. A Senior Instructor had a lower grade, thus giving an employee less supervisory authority. There were no opportunities for grade increases as grade 10 was the only grade available to a Senior Instructor. Finally, the position entailed substantially more travel than Marketing Manager. Accordingly, a reasonable juror could find that Bergman did not fail to mitigate his damages by refusing the Senior Instructor position.
 
 IV.
 
 30
 For the foregoing reasons, the jury verdict and the judgment of the district court are AFFIRMED.
 
 
 
 *
 The Honorable James H. Jarvis, United States District Judge for the Eastern District of Tennessee, sitting by designation