IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

**FILED**

**February 5, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| ROBERT S. LIPMAN, | ) | NO. 01A01-9803-CH-00139 |
| | ) | |
| Plaintiff/Appellant | ) | DAVIDSON CHANCERY |
| | ) | |
| v. | ) | |
| | ) | HON.  ELLEN HOBBS LYLE |
| FIRST NATIONAL BANK OF | ) | CHANCELLOR |
| BOSTON, | ) | |
| | ) | |
| Defendant/Appellee | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALEXANDER H. McNEIL, | ) | |
| J. VIRGINIA McNEIL, | ) | |
| R & J  KNOXVILLE, INC., | ) | |
| | ) | AFFIRMED |
| Former Defendants | ) | |

Robert D. Tuke and Stephen K. Rush, Nashville, for Appellant.
Paul C. Ney, Jr. and Leesa A. Hinson, Nashville, for Appellee.


**O P I N I O N**

INMAN, Senior Judge

The trial court granted the motion of defendant First National Bank of

Boston ("First National") for summary judgment, which the plaintiff ("Lipman"]

appeals, insisting that there are genuine issues of material fact.

Lipman filed suit against Alex and Virginia McNeil (husband and wife),

First National Bank of Boston, and R & J Knoxville, Inc., when a real estate

limited partnership involving the McNeils as general partners and Lipman as one

of a number of limited partners sold the real property it owned, resulting in the loss

of Lipman's investment because the proceeds from the sale were insufficient to

reimburse the partners. Lipman asserted that, in entering into a Settlement Agreement with First National and selling the partnership property, the McNeils had conspired with the bank to deprive him of his investment, and that the bank had induced the McNeils to breach their limited partnership agreement and/or the fiduciary duty they owed to him.

Prior to the Chancery Court's ruling on the McNeils' summary judgment motion, Lipman reached a settlement with the McNeils. Former defendant, R & J Knoxville, Inc., no longer exists and therefore was dismissed as a defendant. The court then heard a summary judgment motion by First National, the only remaining defendant. The trial court's granting of the bank's motion for summary judgment is the subject of this appeal.

# I

When these transactions occurred, the McNeils were partners in over one hundred real estate limited partnerships in various States, which were mortgaged to the extent of at least $60 million, usually through First National. McNeil testified that all of the ventures involved bank work-outs, in which distressed commercial property is purchased with the aid of bank financing, refurbished, leased up, and in this case, sold. McNeil had a large staff which investigated potential properties and cooperated with the bank to determine which projects were suitable for investment. He was not always involved in day-to-day operations; he remembers some particulars but testified essentially that at times negotiations were conducted by his and the Bank's staff.[1]

---

[1] He does not know Lipman personally and, when asked whether he had "been involved as a defendant in any lawsuit other than this one involving his real estate investments since 1985," answered "No."

Washington Square I, the building which is the subject of this lawsuit, was owned prior to these transactions by a partnership formed in 1983, which included Lipman as a limited partner, but in which McNeil had no interest. In the midst of financial difficulties,[2] and with Lipman voting in favor, Washington Square I was sold to a new partnership in 1986. Alex and Virginia McNeil became the new general partners, Lipman became a limited partner, and Dominion Bank held the mortgage. The partnership undertook to rehabilitate, operate, maintain and lease the property.

The McNeils also owned a group of commercial buildings known as Washington Square II, which shared common walls, hallways, electrical systems and HVAC with Washington Square I. Lipman knew that McNeil had interests in Washington Square II when he voted for McNeil to assume general partnership of Washington Square I, and he was informed of the overall strategy to market Washington Square I and II as a single property for purposes of attracting new tenants.

McNeil testified:

We all considered that it would be best if both properties were joined together like common ownership. We always considered that. It was rather basic. It was much more efficient for these properties to be joined together.

Lipman testified:

Q: Okay. When were you first informed that that was going to occur? That, you know, the two buildings would basically be treated as one for purposes of marketing them to potential tenants?

_____

[2]The record shows that limited partners were dissatisfied, the building had been denied historic certification due to improper rehabilitation of the windows, results of marketing efforts were below projected expectations, rental income was insufficient to service accounts payable, there were problems in obtaining fire insurance due to low building occupancy, two trade creditors had sued the partnership on overdue accounts, the lender, Dominion Bank, had prepared for and scheduled foreclosure proceedings under the construction loan documents, and the partnership had taken steps to file Chapter 11 Bankruptcy. [T.R., pp. 328-329]

A:     When McNeil entered into the management of the buildings.  They described what their overall strategy was going to be.

Q:     Back in '86?

A:     Whenever that date was, yes.

When the 1986 Washington Square I partnership was formed, the Washington Square I building was 70% to 80% leased to tenants, although as noted, it was not profitable.  The Washington Square II property had very few, if any, tenants.

The Washington Square II property, which was mortgaged by First National, also suffered financial difficulty and, in August, 1987, in negotiations with that bank, McNeil executed a Promissory Note and Deed of Trust to First National for $14.5 million ("the Washington Square II note"), as well as a personal guarantee of approximately $8.5 million and a security interest to First National in McNeil's interest as a general partner in the Washington Square I partnership.

On August 28, 1990, after two extensions of the due date on the $14 million Washington Square II note, McNeil and First National entered into a Settlement Agreement which conveyed Washington Square II to a wholly-owned subsidiary of the bank by warranty deed dated August 30, 1990, but which was not to be recorded until January 2, 1991, thus allowing time for McNeil to sell the property. The Agreement provided specifically, in part:

> If, prior to the closing date, [McNeil] furnishes proof satisfactory to [First National] that Dominion Bank has agreed to forbear from exercising its rights and remedies with respect to [Washington Square I] for a period of six months from the date hereof in order to permit Alex, the Company and [the Washington Square II Partnership] to market the [Washington Square II property] together with the [Washington Square I property] (collectively, the "Joint Properties") . . . [First National] agrees . . . that the [Washington Square II conveyance to the bank subsidiary] shall not be recorded at this time, but shall be held in escrow by [First National] until January 2, 1991,

4

at which time they shall be automatically released to [First National] and [First National] may at its option record them at any time.

The testimony about the joint marketing for sale of Washington Square I and II was provided through the depositions of a bank officer, Lipman and McNeil.

Mr. Jeffrey J. Ingram, commercial real estate lender (now vice-president) who has been employed with First National since 1987 and is the only person still employed by the bank who was involved with the McNeil loans testified:

Q: Why did the Bank require that the two properties [Washington Square I and II] be marketed jointly?

A: We didn't require it.

Q: The Bank did require them to be jointly marketed, did it not?

A: As I recall it, Mr. McNeil asked us to allow him to market it jointly.

* * *

A: We had collateral interests in a bunch of things, but at no point did we ever tell Alex he had to do this, he had to do that . It was all - - it's a settlement agreement. It lays out what --

Q: But it says he'll sell all of the October collateral within five years. Are you aware of that provision in there?

A: But it doesn't say - - where does the control come under that?

Q: Well, the control, to the extent that [First National] has obtained from McNeil . . . the contractual obligation to sell these properties within five years. Do you not recognize that as a form of control?

A: No. I mean, I don't. I'm a lender. I get collateral.

On June 14, 1991, McNeil informed the Washington Square I limited partners by letter that a buyer had been found and asked for their immediate consent in writing to the sale of the property. Lipman did not consent, but instead

requested more information by reply letter. However, 52% of the limited partners did consent, and therefore, since terms of the partnership agreement required only the consent of 51%, the sale of Washington Square I to Corim was consummated on June 24, 1991, for a price which substantially exceeded its appraised value as of March 1991. Proceeds of the sale paid off the Dominion Bank note ($3,105,596.34) and paid closing costs and partnership administrative expenses. However, after the sale, the Washington Square I partnership was insolvent, with debts that exceeded the value of its assets by at least $800,000.00.

Also on June 24, 1991, Washington Square II was conveyed to Corim by quitclaim deed for consideration which included the release of Alex McNeil's $8 million personal guarantee. The following day, Corim sold Washington Square I and Washington Square II to SAP (International) A.G.

## II

Lipman contends that First National is liable to him for conspiring with the McNeils and/or inducing the McNeils to breach their partnership agreement with him and/or the fiduciary duty the McNeils owed to him.

The trial court, relying specifically on the Settlement Agreement between the Bank and the McNeil interests, the deposition of Alex McNeil, and the deposition of Jeffrey Ingram, held that the record does not raise any genuine issues of material fact so as to warrant a trial. The court held that the plaintiff's contention "that the Bank *controlled* the McNeils is not supported by the text of the Settlement Agreement even to the extent of raising a genuine issue of material fact" [emphasis in original]. The court also found that there was insufficient proof in the deposition of Alex McNeil that negotiations between the bank and McNeil amounted to conspiracy or inducement to breach against plaintiff. Finally, and as

6

to whether the bank induced McNeil to violate his fiduciary duty to plaintiff in marketing Washington Square I as part of a package with Washington Square II, the court held that "as a matter of law, the terms of the Settlement Agreement did not *obligate* marketing of the limited partnership property and the McNeil's other property together" [emphasis in original].

_____

## III

Summary judgment is proper when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn. 1993). On a motion for summary judgment, the courts must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id. at 210-11.* In *Byrd,* the Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial. "If he does not so respond, summary judgment . . . shall be entered against him."

*Id. at 211* (citations omitted). Summary judgment is only appropriate when the case can be decided on the legal issues alone. *Id. at 210.* Because only questions of law are involved, there is no presumption of correctness regarding a trial court's grant o summary judgment. *Johnson v. EMPE, Inc.,* 837 S.W.2d 62, 68 (Tenn.

7

App. 1992). Therefore, our review of a trial court's order granting summary judgment is *de novo* on the record before this Court. *See Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn. 1995).

**IV**

On appeal, Lipman argues that the trial court erred in finding that the affidavits, depositions and documents in the record fail to show a genuine issue of material fact as to whether First National Bank of Boston *conspired with, induced or aided* the McNeils in breaching their Limited Partnership Agreement with him and/or the fiduciary duty they owed to him. He asserts that the bank *controlled* the McNeils' dealings with him such that his claim of breach of duty against them, now settled, raises a separate claim against the bank.

**V**
**CIVIL CONSPIRACY**

A civil conspiracy is a "combination between two or more persons to accomplish an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Dale v. Thomas H. Temple Co.,* 208 S.W.2d 344, 347 (Tenn. 1948). The essence of a civil conspiracy is a concert or combination to defraud or cause other injury to person or property, which results in damage to person or property of the plaintiff." *Kirksey v. Overton Pub., Inc.,* 739 S.W.2d 230, 236 (Tenn. App. 1987). The elements of civil conspiracy are "common design, concert of action, and an overt act." *Id.* In addition, the primary purpose of the agreement must be to cause injury to another; incidental injuries resulting from a pursuit of the parties' own fair interest are not actionable. *National Med. Care, Inc. v. Gardiner,* No. 85-154-II, 1986 Tenn. App. LEXIS 3559; WL 3157 (March 12, 1986) (citing 16 Am. Jur. 2d Conspiracy § 49).

The record in this case contains no facts indicating an agreement between the McNeils and the bank with for the purpose of causing injury to Lipman. Indeed, there are no facts, save for bare speculation, at most, that Lipman actually suffered injury by this transaction. While it is true that he lost his investment by the sale of Washington Square I, the property was in dire financial condition when purchased by the McNeil interests. Although it was 70 to 80% leased, the tenants' payments were insufficient to service accounts payable, two trade creditors had sued on overdue accounts and Dominion Bank had scheduled foreclosure proceedings. The partnership had taken steps to file Chapter 11 Bankruptcy. While Lipman testified that he expected an improvement in the partnership's financial condition and did not want the property sold, nothing in the record supports that expectation, and 52% of the limited partners voted to sell.

Assuming, *arguendo,* that the loss of Lipman's investment was caused directly and even solely by the sale of the Washington Square I property, there are still no facts which indicate that the McNeils and First National Bank conspired for the purpose of injury to him. McNeil testified that he did not know Lipman. He recalled the sale of Washington Square I because it was on a list of properties given to him by his staff before he was deposed. He was indebted for over $60 million in mortgages on commercial property in various states. Lipman's investment of less than $200,000.00 amounted to a fraction of McNeil's exposure on this one project alone, which exceeded $8 million. McNeil testified that he tried to please the bank, which could call in his notes and place him in bankruptcy, but that it was all a matter of negotiation. The commercial lender from First National Bank testified that he did not tell McNeil what to do: "I'm a lender. I get collateral."

9

## VI
## INDUCING OR AIDING
## BREACH OF PARTNERSHIP AGREEMENT
## OR FIDUCIARY DUTY

Lipman's allegations that First National induced or aided the McNeils to breach the Washington Square I partnership agreement or their fiduciary duty is grounded upon the McNeils' failure to disclose to him their Settlement Agreement with First National on Washington Square II. However, there is no evidence whatsoever as to what the 52% of limited partners who approved the sale knew or didn't know, and whether any such knowledge would have changed any of their votes. Simply stated, Lipman's vote did not carry enough weight, regardless of what he knew or did not know, to prevent the sale of Washington Square I. Since he failed to submit the affidavit of any other limited partners to show that any partner would have, or might have, voted "no" under any conditions, his arguments that the McNeils violated their partnership agreement or fiduciary duty by failing to obtain "informed" consent and by selling Washington Square I raise no genuine issue of material fact.

## VII

### CONTROL OVER GENERAL PARTNERS

Finally, Lipman alleges that an issue of material fact exists as to whether the bank "took control of the Partnership's assets and required the McNeils to sale [sic] those assets at a time when such a sale was not necessary."

When asked why the Bank required the McNeils to be marketed jointly, Jeffrey Ingram of First National Bank answered, "We didn't require it . . . as I recall it, Mr. McNeil asked us to allow him to market it jointly . . . at no point did we ever tell Alex he had to do this, he had to do that . . ."

Although Lipman earnestly insists that the Bank controlled Alex McNeil's business decisions, we find no evidence in the record to that effect. In order to defeat summary judgment, Lipman must present specific admissible facts which realistically challenge the McNeils' stated reasons for their business decisions. *Wilkins v. Eaton Corp.,* 790 F.2d 515, 521 (6th Cir. 1986); *Silpacharin v. Metropolitan Gov't.,* 797 S.W.2d 625, 629 (Tenn. App. 1990). However, if the facts and conclusions to be drawn from the facts are such that a reasonable person would only reach one conclusion, summary judgment should be granted. *McClung v. Delta Square Limited Partnership,* 937 S.W.2d 891, 894 (Tenn. 1996).

We find the record in this case does not raise any genuine issues of material fact so as to warrant a trial and, accordingly, the judgment of the trial court granting the motion of defendant First National Bank of Boston for summary judgment is affirmed at the costs of the appellant.

_____
William H. Inman, Senior Judge

CONCUR:


_____
Houston M. Goddard, Presiding Judge


_____
Herschel P. Franks, Judge