James **LOPER** and Janie **Loper, Plaintiffs,**

v.

**COMPUTER NETWORK TECHNOLO-GY CORPORATION, a Minnesota corporation, and Nicholas Ganio, jointly, severally and individually, Defendants.**

No. 00–70247.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 23, 2001.

Cheryl B. Lord, Plunkett & Cooney, PC, Ann Arbor, MI, for Plaintiff Counsel.

James E. Brenner, Clark Hill, PLC, Detroit, MI, Robert R. Reinhart, Julie Meany, Dorsey & Whitney LLP, Minneapolis, MN, for Defendants' Counsel.

## OPINION AND ORDER

FEIKENS, District Judge.

## I. INTRODUCTION

Plaintiff James Loper (Loper), a Michigan resident, was employed by Computer Network Technology Corporation (CNT), a Minnesota corporation, as a Regional Sales Manager (RSM) from June 1997 until May 1999. Each year he received an annual quota for sales, divided into quarters, and his compensation was governed by a separate annual compensation plan incorporating the quota. In 1998, Loper fell short of his quota for the last two consecutive quarters, and fell short again for the first quarter of 1999. In May 1999 Loper voluntarily resigned from CNT and began immediate employment elsewhere. He was then fifty-eight years old.

Loper filed a complaint in 1999 in the Wayne County Circuit Court against CNT claiming five separate counts: age discrimination under Michigan's Elliott–Larsen Civil Rights Act, breach of contract, violation of the Michigan Sales Representative's Act and unjust enrichment. Loper's wife, Janie Loper, joined in the complaint for the last count, loss of consortium. CNT removed the complaint to this court pursuant to the diversity of the parties. CNT has now moved for summary judgment on all counts of the complaint.

## II. BACKGROUND

### A. THE COMPENSATION PLAN

The parties agree that the contract that governs this action is CNT's 1998 Compensation Plan (the Plan). The relevant sections of the Plan are as follows:

§ 1.1 *Term*

The Plan shall be effective January 1, 1998, and shall terminate on December 31, 1998 unless extended in writing by the Vice President of Sales.

§ 1.4 *Territorial Considerations*

CNT may revise territories, re-assign RSM's, re-assign and/or establish House Accounts, National Accounts, Strategic Account representation and assign or re-assign specific accounts within an RSM's assigned territory.

§ 2.0 *Incentive Compensation Based On*

CNT will calculate incentive compensation based on the net value of Qualifying Domestic Product Revenue....

§ 2.1.2 *Qualifying Domestic Product Revenue Is Defined As:*

The net sell price for Products (i.e. hardware, software, installation, professional services, rental and lease payments) sold in the United States and Canada that is recognized as Product revenue in CNT's financial statements. Domestic Product Revenue is credited towards an RSM's quota.

§ 4.0 *Product Revenue Quota*

Attainment against quota is defined as the net Qualifying Product Revenue recognized by CNT during 1998.

### B. THE DISPUTED ACTIONS BY CNT

Loper filed his complaint on the basis of CNT's treatment of two of his accounts and the removal of one territory. The background of each account and the removed territory is explained in detail.

**1064**

### 1. THE CHRYSLER ACCOUNT

In 1998 Loper worked on an order for Chrysler Corporation, purchased through a middleman leasing company, TechTeam. In December 1998, Loper received a purchase order from TechTeam on behalf of Chrysler for almost $900,000. The purchase order provided:

Payment of the above equipment will be made once all equipment is delivered and within 30 days after receipt of TechTeam's executed acceptance documents from Chrysler Purchasing.

The order was shipped in December 1998, but this language provided that payment would not be made until Chrysler had assured TechTeam that it had accepted the equipment. Since the order was not shipped until December, this contingency left CNT without knowing if the goods were accepted until the first quarter of 1999; CNT was unable to recognize the revenue in 1998. Area Sales Director (ASD) Brad Murphy (Murphy), Loper's immediate supervisor, tried to remove this contingency in December 1998 in order to allow the revenue to be recognized in 1998[1]. Murphy Affidavit, ¶ 4. Loper also worked to remove this contingency. *Id.* Their attempts were unsuccessful; neither Loper nor Murphy received credit for the order in 1998.[2] CNT received payment for the order in March 1999, at which point Loper received credit for the sale.

Because the Chrysler order was almost certain to revenue in the first quarter of 1999, Murphy took the amount for which Loper would receive credit into account when setting Loper's quotas for 1999. Loper's first quarter 1999 quota included the Chrysler order figures.

### 2. THE EDS/CHEVRON ACCOUNT

Since before Loper began working for CNT, EDS operated as a split account between two RSMs, one in Texas and one in Detroit. Each RSM received 50% of the commissions, regardless of who did the work. In 1998, CNT decided one RSM for the account would be better for both EDS and CNT. CNT assigned the account to the RSM in Texas, Al Walker (Walker)[3], who was closer to EDS headquarters in Texas, and had more experience selling to data centers than Loper, the RSM from Detroit. Though Loper left the account in September 1998, the reassignment was not official until January 1, 1999.

In December 1998, Walker secured orders from EDS for approximately $900,000.00, $300,000.00 of which was accepted and revenued in 1998. The remainder was revenued in January 1999 after the RSM change had become effective. Loper was offered the opportunity to reserve the account for the January commissions, but declined because he was told that the expected accounts would be added to his first quarter quota for 1999. Loper received the proper commission based on the $300,000.00 revenued in 1998, and received a "transition bonus" equal to a commission based on the amount revenued in January 1999. He did not receive quota credit for the January compensation because he did not reserve the account.

### 3. THE CLEVELAND TERRITORY

Prior to 1999, the Cleveland Territory had been part of Loper's territory in the Central Region. In 1998 CNT opened a new office in Pittsburgh, Pennsylvania as part of the Eastern Region. The ASDs for both the Eastern and Central Regions decided that Cleveland should be moved from the Central Region into the Eastern Region. Murphy Affidavit, ¶ 15. This resulted in Carole Katz, a 57 year old woman, replacing Loper as the RSM for the Cleveland territory. Loper was given the

---

**1.** An ASD also receives compensation for the sales of his or her RSMs, in the same period as the RSM.

**2.** Because Murphy took a new position with CNT in 1999, he never received any compensation for the Chrysler order. His replacement received the compensation in the first quarter of 1999.

**3.** Walker was 41 years old.

opportunity to reserve any pending accounts but declined because there was nothing he could "commit to" as a forecasted sale. Loper dep., p. 209.

## C. DEFENDANT NICHOLAS GANIO

CNT hired defendant Nicholas Ganio (Ganio) as Vice President of World Wide Sales in the spring of 1998. The former ASD of the Eastern Region, Michael Begley (Begley), has stated that Ganio made remarks to him regarding RSMs in their 50's as being "tired" and "old-looking". Begley Aff. ¶ 3. Begley further stated that Ganio said he wanted a "younger blood" salesman profile, with more "aggressive", "energetic", and "younger" RSMs with "fire in their bellies".

## III. DISCUSSION

Each count has a separate analysis. Each is discussed in the order it is presented in the complaint.

## A. COUNT I—AGE DISCRIMINATION

Loper alleges that the decisions affecting the Chrysler order, the EDS account, and the Cleveland territory were made by Ganio, motivated by age discrimination. This violates Michigan's Elliot Larsen Civil Rights Act (ELCRA). MCL § 37.2202(1)(a).

A plaintiff bringing suit under ELCRA must first establish a prima facie case. *Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906 (1998). Actions filed under ELCRA are analyzed under the three-part framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.*

A plaintiff can meet his original evidentiary hurdle under the McDonnell–Douglas framework of establishing a prima facie case by showing intentional discrimination through direct evidence (the "direct evidence" approach), or by showing disparate treatment through indirect evidence (the "disparate treatment" approach). *Bryant*

*v. Automatic Data Processing, Inc.*, 151 Mich.App. 424, 428, 390 N.W.2d 732 (1986). Loper asserts that he overcomes his initial burden under both approaches.

## 1. DIRECT EVIDENCE OF DISCRIMINATION

Loper argues that he has direct evidence of discrimination. The comments made by Ganio to Begley, calling employees over 50 "tired" and "old-looking", and needing new "aggressive" employees with "fire in their bellies" constitute direct evidence of age discrimination.

 The United States Court of Appeals for the Sixth Circuit has repeatedly held that isolated ambiguous comments out of context do not constitute direct evidence of age discrimination. *Carpenter v. Western Credit Union*, 62 F.3d 143, 145 (6th Cir.1995); *Cooley v.. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994); *Phelps v. Yale Security, Inc.*, 986 F.2d 1020 (6th Cir.1993). In *Phelps*, the Sixth Circuit affirmed the district court's finding that comments made directly to the plaintiff by the supervisor who fired her, saying she was "too old" to hold her previous position, and that her fifty-fifth birthday was cause for concern, were too isolated and ambiguous to support a finding of age discrimination. *Phelps*, at 1025.

 I find that the comments Begley has stated that Ganio said to him are too isolated and out of context to support a claim of age discrimination. Begley was the ASD of the Eastern Region, unconnected to Loper's territory, and cannot point to any comment made regarding Loper directly; nor does he give a relevant time period for the comments. The phrases Begley recalls are at best ambiguous, and indefinite as to whether they apply to salesmen or to attitudes about selling. Loper has not established a "direct evidence" case of age discrimination.

## 2. THE DISPARATE TREATMENT

 In order to establish a prima facie case through the disparate treatment approach, Loper must establish four ele-

ments: first, that he is a member of the protected class; second, that he was subject to adverse employment action; third, that he was qualified for his job; and finally, Loper must show that he was treated differently than similarly situated younger employees. *Lytle,* 458 Mich. at 177, 579 N.W.2d 906. The first and third elements are not disputed.

Defendants argue that Loper suffered no adverse employment action. Loper was not terminated from CNT; he left voluntarily to take another position elsewhere, a position in which he receives both a higher base salary and higher commissions. Loper dep. p. 34.

Loper responds that the adverse employment action was constructive discharge. Loper asserts that because he was removed from the EDS account and the Cleveland territory, and given an inflated first quarter quota for 1999, he was set up to be terminated. He adds that the March 2, 1999 email from his ASD Kevin Billiet (Billiet), threatening that Loper may be placed on a performance plan, was the final warning that he would soon be fired. Loper dep., p. 97. He left in May 1999 in order to avoid being fired.

 Constructive discharge may be found in Michigan where working conditions are so difficult or unpleasant that a reasonable person would feel compelled to resign. *Jenkins v. Southeastern Mich. Chapter, Am. Red Cross,* 141 Mich.App. 785, 796, 369 N.W.2d 223 (1985). When an employee alleges that he was forced to resign, the employee's perception must be judged objectively without consideration of his undue sensitivities. *Henry v. Lennox Indus. Inc.,* 768 F.2d 746, 752 n. 3 (6th Cir.1985). The employee has "an obligation not to assume the worst, and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 515 (6th Cir.1991).

 Though Loper may not agree with CNT's decisions, a plaintiff may not demonstrate age discrimination merely by

challenging the soundness of his employer's business decisions. *Peecook v. Northwestern National Insurance Group,* 156 F.3d 1231, 1998 WL 476245, *4 (6th Cir. 1998); *Wilkins v. Eaton Corp.,* 790 F.2d 515, 521–523 (6th Cir.1986). *See also Vannoy v. OCSEA Local 11,* 36 F.Supp.2d 1018 (S.D.Ohio 1999) (Court found that the loss of supervisory authority, unpleasant exchanges with supervisors, reprimands and transfer were not objectively unreasonable working conditions). CNT used its own business judgment in reassigning the Cleveland territory; CNT moved the territory not just to another RSM, but to another region. Likewise, CNT consolidated the EDS account in order to have the responsibility fall to one RSM, and chose the RSM located in the territory of EDS' headquarters. Loper has failed to present evidence that his conditions were so difficult that a reasonable person would have felt compelled to resign.

Further, the tone of the email threatening to reprimand Loper is purely of forewarning and encouragement. *See* Billiet Aff., Ex. O. Billiet reviewed Loper's actual results over the last two quarters of 1998, both of which fell short of quota, and the 1998 annual quota shortage, and points out that if the Chrysler order did not close by the end of the present quarter (March 31, 1999), Loper would be falling short of his quota for the third consecutive quarter. Billiet did say that if the quarter ended that day (March 2), Loper would receive a written warning; Billiet also added that he thought they could avoid any further discussion at all if Loper just closed the Chrysler deal and one of the other two accounts on which he was presently working. To this end, Billiet stated he would be willing to help in any way he could, by "creative pricing, removing road blocks, etc.". Nothing in the email, nor the followup, creates an atmosphere that would compel a reasonable person to resign.[4]

Thus, Loper does not meet the second element of a prima facie case under the disparate treatment approach.

---

**4.** Loper did fall short of his first quarter quota

because although he did close the Chrysler

Even if Loper could establish that he was constructively discharged, he has not established the fourth element either, that younger employees were treated differently than he in a similar situation. To be deemed "similarly situated", individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992).

Loper does not offer any situation which is reasonably similar to his, let alone fulfill the Sixth Circuit standard. Loper does not submit any purchase order held by another employee in which the order language did not allow CNT to recognize the revenue in the same quarter in which it was sold, similar to the Chrysler order. Loper further admitted that the Chrysler order scenario, in which one commission, certain to revenue without further sales work, was unique; that he had never heard of another situation where one order was fifty percent of an annual quota.. Loper dep. pp. 86–87. Likewise, Loper does not point to any other situation similar to a territory changing regions or an account consolidating to one RSM. Loper has not compared himself to other younger salesmen who were similarly situated.[5]

I also note that CNT offers legitimate business reasons for changing the EDS account to one manager which Loper does not overcome. It is not the court's responsibility to evaluate the sensibility of CNT's business judgment, but to distinguish between a genuine business decision

order, he failed to close any new accounts. He was not reprimanded.

5. Moreover, Loper has not established that younger employees were treated better in general. Loper's 1999 annual quota was the lowest of all of the RSMs in CNT's Central

and a reason manufactured to avoid liability. *See Peecook,* at *5; *see also Hartsel v. Keys,* 87 F.3d 795, 800 (6th Cir.1996). The subjective belief by the employee that decisions were motivated by age bias is not enough to sustain a claim of age discrimination in the face of the employer's offered legitimate reasons. *See Mitchell* at 583. CNT asserts the decision was based on the advice of Monte McDavid, who was in charge of the EDS account from before the time Loper was employed at CNT. McDavid saw EDS as a Texas based company, that lived and breathed in Dallas, and needed attention from someone in Dallas. McDavid Aff. ¶7. McDavid tried to "push that issue pretty heavily", and Loper admits that there was "room for a manager to agree to that". Loper dep. pp. 127–128. Nothing in the record substantively contradicts CNT's evidence of the rationale behind the account consolidation.

Because Loper fails to set forth either a direct evidence case of age discrimination or a prima facie case of disparate treatment, Count I of his complaint fails.

### B. COUNT II—BREACH OF CONTRACT

Loper contends that CNT's actions regarding setting his first quarter 1999 quota, denying commissions on the Chrysler order in 1998, consolidating the EDS account, and removing Cleveland from his territory each breached his 1998 Compensation Agreement with CNT.

#### 1. THE CHRYSLER ORDER

Loper argues that his fourth quarter quota for 1998 should have been credited, and his commission paid, upon shipment of the goods to Chrysler in December 1998. CNT responds that he could not be credited or paid until the order was revenued; that is, until CNT was paid by Chrysler.

Region except for one salesman who was three years older than Loper, and one salesman who had been hired in October 1998. Likewise, Loper's replacements on the EDS account and in the Cleveland territory were both over 40 themselves.

The 1998 Compensation Agreement clearly states that incentive compensation (i.e., commissions) will be based on the net value of Qualifying Domestic Product Revenue (§ 2.0). "Qualifying Domestic Product Revenue" is defined as the net sell price for products that is *recognized as product revenue in CNT's financial statements.* (§ 2.1.2). Further, § 4.0 dictates that attainment against a salesman's 1998 quota is limited to the net qualifying domestic product revenue *recognized in 1998.* Thus, in order to receive a commission or to attain credit against one's quota under the 1998 Plan, the transaction must be recognized on the company's financial statements in 1998, which cannot happen until CNT is paid. Jeffrey Bertelsen, CNT's Corporate Controller and Treasurer, noted that this is in accord with Generally Accepted Accounting Principles. Bertelsen Aff., ¶ 10.

The contract is clear that CNT must have a guarantee of payment before a commission is earned. In this case, TechTeam attached a provision which allowed them an indeterminate time in which to pay CNT. Billiet, Murphy, and Loper all tried to persuade TechTeam to change the language to something which would allow CNT to recognize the revenue in 1998. *See* Billiet Aff., ¶ 15, Ex. L; Murphy Aff. ¶ 4. TechTeam did not agree to change the language. Loper continued to work with Chrysler to receive payment for the order, and repeated emails confirm that he knew the lack of payment was of great concern to CNT. Billiet Aff. Ex. M. Moreover, Loper also realized that he was not going to receive his commission, or credit his quota, until the revenue was recognized by CNT. *Id.* Loper received credit against his quota and was paid after CNT received payment for the goods in March 1999.

■ I find the contract clear on this point. I also find that Loper realized he would not be paid until CNT recognized

the revenue from the Chrysler order. Since Loper was paid the proper amount as soon as CNT did recognize the revenue, CNT did not breach its contract with Loper.[6]

## 2. THE 1999 FIRST QUARTER QUOTA

Loper also contends CNT breached its contract with him by taking the Chrysler order into account when setting his 1999 quota. However, nothing in the contract dictates how the management must set the quarterly quotas for each salesperson. Murphy, the ASD for Loper's region, states in his affidavit that he set each RSM's quota, after receiving the region's quota from Ganio. Murphy Aff. ¶ 5. He further explains how he established Loper's quota for 1999, noting that he added the expected Chrysler order into the first quarter because it "was almost certain to revenue". Murphy Aff. ¶ 6. Loper admits he knows nothing of the quota setting process. Loper dep. pp. 81—85.

■ Given the testimony and the lack of contractual language prohibiting it, I find that CNT did not breach its contract with Loper by front-loading his first quarter quota in 1999.

## 3. THE EDS ACCOUNT

Loper alleges two breaches regarding the EDS account. First, he argues that reassigning EDS to one RSM was a breach of contract. Second, he argues that in any event he should have been credited and paid for the $900,000.00 order that came in the fourth quarter of 1998.

According to Bertelsen, CNT's Treasurer, CNT recognized only $300,000.00 of the EDS order in the fourth quarter of 1998. Bertelsen Aff. ¶ 10. Loper admits he was paid for this amount in full. Loper dep. p. 118:

The remainder of the order was not recognized by CNT until January 1999.

---

6. In his Supplemental Brief, Loper asserts that CNT violated § 5.0 of the Plan which states CNT shall pay incentive compensation when earned. This argument is flawed; § 5.0 does not define when the compensation is earned; it follows the sections which make clear that commissions are earned when the account is revenued.

CNT had allowed Loper to remain in name on the EDS account for the fourth quarter of 1998, though Loper admits he did not do anything on this order after September. Loper dep. 120—121. By the time the remainder was revenued, Loper was officially removed from the account. He had been given the opportunity to reserve both the quota credit and the commissions but declined because he did not want his first quarter of 1999 inflated more than it was.

Loper first asserts that CNT was in breach of contract by removing him from the EDS account. However, the Plan specifically states that CNT may revise territories or reassign RSMs to or from specific accounts at will. Plan, § 1.4. CNT is clearly allowed by contract to reassign the EDS account to one RSM.

██ Second, in deciding whether CNT breached its contract by requiring Loper to reserve the account to gain quota credit for the first quarter of 1999, I have already found that CNT was at liberty to handle the quota setting as it saw fit. Moreover, Loper was paid in accordance with CNT's stated policies, in which a salesman was paid when the order revenued. Loper further admits he was removed from the account before the account was closed, and received benefits from it anyway. CNT did not breach its contract with Loper by the way it paid Loper regarding the EDS account.

#### 4. THE CLEVELAND TERRITORY

Loper argues that taking the Cleveland territory away from him was a breach of contract. However, the Plan expressly allows CNT to reassign territories. Plan, § 1.4. I note that CNT allowed him to reserve any potential accounts he had in the Cleveland territory and he was unable to do so.

### C. COUNT III—VIOLATION OF THE MICHIGAN SALES REPRESENTATIVE'S ACT, M.C.L. § 600.2961

Loper also asserts a statutory violation based on the failure to pay his EDS and Chrysler commissions when due. I have found that CNT did pay Loper his commissions when due. Absent a showing that CNT failed to pay owed commissions, Loper cannot proceed under this statute. *See Clark Brothers Sales Co. v. Dana Corp.,* 77 F.Supp.2d 837 (E.D.Mich.1999).

### D. COUNT IV—UNJUST ENRICHMENT

Loper argues that CNT received a benefit, his unpaid commissions, from his efforts.

██ First, no claim of unjust enrichment can exist where there is a controlling contract governing the relationship between the parties. *Terry Barr Sales Agency v. All–Lock Company, Inc.,* 96 F.3d 174 (6th Cir.1996). However, even if that were not the case here, Loper was paid all of his commissions in full according to the Plan. In fact he was also paid the commission for the January portion of the December 1998 EDS order though he did not reserve the account. I find no claim for unjust enrichment.

### E. COUNT V—LOSS OF CONSORTIUM

██ Loper's wife has alleged the loss of consortium based on Loper's complaint. The derivative claim of loss of consortium stands or falls on the primary claims in the complaint. *Long v. Chelsea Community Hospital,* 219 Mich.App. 578, 557 N.W.2d 157 (1996). Since Loper has no claims that survive this motion, Mrs. Loper's claim of loss of consortium necessarily fails.

## IV. CONCLUSION

For the foregoing reasons, I GRANT the defendants' motion for summary judgment on all counts of the complaint.

IT IS SO ORDERED.